## In the Matter of LOVE CANAL.

Fourth Department, April 1, 1983

**APPEARANCES OF COUNSEL**

*Phillips, Lytle, Hitchcock, Blaine & Huber* (*Alice Kryzan* of counsel), for appellants.

*Hurwitz & Fine, P.C.* (*Dan Kohane* of counsel), for County of Niagara, appellant.

*Stanley Grossman* (*Richard Berger* of counsel), for respondents.

*Robert Abrams, Attorney-General* (*Beryl Kuder* of counsel), for New York State Department of Health, intervenor-respondent.

#### OPINION OF THE COURT

SCHNEPP, J.

These lawsuits involve 600 separate unconsolidated actions and approximately 1,400 plaintiffs who claim to have suffered personal injuries as a result of exposure to chemicals escaping from the "Love Canal". For pretrial and discovery purposes the parties and the court have treated these actions under the caption "In Re Love Canal Actions". Defendants appeal from the denial of their joint motion for co-ordinated discovery of medical documents in possession of the New York State Department of Health.[1]

By way of background,[2] which is not in dispute, Hooker Chemicals & Plastics Corporation from 1942 until 1953 utilized a ditch, known as the Love Canal, as a chemical waste landfill. In 1953 the property containing the landfill was conveyed to the Niagara Falls School District. Subsequent transactions conveyed portions of the property to the City of Niagara Falls and to several individuals. Although no homes were constructed on the property, many residences were built on land abutting the former landfill.

In 1978 the Legislature adopted title XII of article 13 of the Public Health Law (L 1978, ch 487) and, because of the potential hazard believed to exist at the Love Canal landfill site (Public Health Law, § 1385), directed the Commissioner of Health to "conduct a study of * * * the * * * effects of health hazards associated with exposure to toxic substances emanating from certain landfills." (Public Health Law, § 1386). The Legislature also authorized the commissioner to declare the existence of an emergency if he found "great and imminent peril to the health of the general

---

1. For purposes of this appeal, the Department of Health has been granted the status of intervenor-respondent.

2. See *Matter of Mervak v City of Niagara Falls,* 101 Misc 2d 68; *Snyder v Hooker Chems. & Plastics Corp.,* 104 Misc 2d 735.

public" (Public Health Law, § 1388) and directed him to report to it and the Governor by September 15, 1978 (Public Health Law, § 1389).[3]

In the spring of 1978 the Department of Health began its investigation of the health complaints of the Love Canal residents. In order to study and evaluate these complaints, it prepared a questionnaire[4] which it distributed to area residents. Physician and hospital records of these residents were obtained in order to verify and evaluate the information disclosed by the questionnaires and to statistically analyze medical effects. Other records and the complete medical histories of residents with specific medical problems were obtained and reviewed by the department. Birth certificates and fetal death certificates were also procured for the study. Further, the department searched its confidential files concerning births, deaths, marriages, cancers and drug addictions and obtained sensitive information concerning such topics as pregnancies, abortions and birth control histories. This data according to the Health Commissioner was gathered and studied in an effort to determine whether an increased rate of certain health conditions existed among Love Canal residents and, as determined by these studies, to prevent or minimize adverse health risks within the State. In all, the department conducted 11,100 field interviews of area residents, and under its auspices over 114,000 blood tests were given to 3,919 individual residents. The blood samples were analyzed at the Roswell Park Memorial Institute and the test results were released to the individuals' physicians.

The residents, at the time they completed the questionnaires, consented to their use for research purposes provided their identities were not revealed. Verbal assurances of confidentiality were also given by the department during the course of the investigation. Later, certain of the

---

3. Other special legislation included special property tax abatements in the Love Canal area (Real Property Tax Law, art 17 [L 1979, ch 42]) and establishment of an agency empowered to purchase the homes of Love Canal residents (General Municipal Law, § 501 [L 1979, ch 732]; § 950 [L 1980, ch 259]).

4. The questionnaire sought certain specific demographic information, as well as information as to some 148 specific medical conditions, information concerning present complaints or symptoms, therapeutic history, residential history, occupational history, chemical exposure, social history, family history and patterns of hereditary illness.

residents authorized the release of the accumulated medical information concerning them to certain Federal and State agencies "for litigation purposes" provided their names and addresses were first deleted. Access to the use of this material in a Federal action was subject to the issuance of a protective order by the United States District Court.

In August, 1978 the Commissioner of Health declared a health emergency. Many of the residents were eventually relocated and their homes purchased by a State agency. A program was also commenced by the State of New York to contain the spread of toxic waste from the landfill.

Commencing in the fall of 1978, residents of the Love Canal area began to file notices of claim for personal injuries and property damage against the municipal defendants. The legal actions which are the subject matter of this appeal were commenced for the most part in 1979 and 1980.

The present appeal concerns the defendants' request to inspect and copy documents in the custody of the Department of Health relating to the physical condition of the plaintiffs. Defendants assert that the illnesses claimed to have been caused by exposures to the toxic substances range through every organ system of the body and that each plaintiff has a unique exposure history in terms both of living in the Love Canal area and of their medical and life experience. Defendants contend that there are very difficult causation issues in each of these actions because of the different characteristics of the chemicals which have allegedly escaped, the lengths of alleged exposure to different levels of chemicals, the wide range of manifestation of claimed illnesses allegedly resulting from the exposures, and the real possibility that exposures to other causative agents or the existence of predisposing characteristics may explain the injury in each case. They claim that the Department of Health collected the medical data and engaged in broad discovery from the Love Canal residents for the express purpose of determining these causative factors, that the defendants should have equally broad access to the health data and that without this discovery their preparation for trial will be seriously prejudiced. They

further claim that the Department of Health, and presumably plaintiffs, believe that the data is relevant to either the assessment of the risks, if any, associated with residents living in proximity to the chemical waste stored at the landfill or to the evaluation of specific complaints by particular individuals. The defendants seek the five following categories of data about these plaintiffs: (1) responses to medical questionnaires, (2) physician and hospital records, (3) physician and hospital records submitted by residents seeking relocation, (4) fetal death certificates and medical information or birth certificates, and (5) blood test results administered at the request of the residents for their own information.

At issue is whether the defendants can obtain discovery of this data and these documents assembled by the Department of Health, a nonparty to the litigation. Defendants contend on this appeal that the questionnaires may contain declarations which may constitute admissions; that the data is generally material and relevant to the defense of the actions; that plaintiffs, by bringing their actions and by authorizing the release of the data to certain governmental agencies, have waived any privilege that may exist; and that disclosure is not barred by the confidentiality requirements of section 206 (subd 1, par [j]) of the Public Health Law. They claim that this statute authorizes the commissioner to "receive reports on forms prepared by him" and that only such information must be kept confidential.

■ Special Term held that pursuant to section 206 (subd 1, par [j]) of the Public Health Law a privilege of privacy attaches to the documents in the possession of the Department of Health, that the documents are confidential and not subject to discovery, and that the plaintiffs have not waived this confidentiality by bringing their actions. The court further found that the defendants were free to seek the medical data pursuant to CPLR 3121, other than directly from the Department of Health. We affirm the order of Special Term for the reasons set forth below.

In our analysis we begin by considering section 206 (subd 1, par [j]) of the Public Health Law which provides in pertinent part as follows: "The commissioner shall * * * (j)

cause to be made such scientific studies and research which have for their purpose the reduction of morbidity and mortality * * * In conducting such studies and research, the commissioner is authorized to receive reports on forms prepared by him * * * Such information when received by the commissioner * * * shall be kept confidential and shall be used solely for the purposes of medical or scientific research or the improvement of the quality of medical care through the conduction of medical audits."

This statute plainly states that information imparted to the Commissioner of Health in connection with research or scientific studies designed to reduce "morbidity and mortality * * * shall be kept confidential". An examination of the Bill Jacket discloses that one of the immediate purposes of the statute was to alleviate fears of hospitals and physicians that disclosure of medical records would subject them to civil suit. The statute is worded broadly and there is no indication that the pledge of confidentiality is not intended to encompass data obtained from any source.

Special Term held that the Legislature created a privilege of privacy for State conducted health emergency studies with two public policies in mind: "(1) protection of the privacy of the State's citizens, and (2) the creation of an atmosphere of trust, to enable the Health Department to gather and compile complete health data it needs to carry out its statutory purpose." We agree that the clear intent of the Legislature was to allow the Department of Health to freely conduct studies and research aimed at improving public health and upgrading the quality of medical care within the State (see, generally, NY Legis Ann, 1963, p 276). It obviously felt that a guarantee of confidentiality would insure the voluntary participation of others in such studies.[5] It is a logical assumption that the 1978 legislation and directives did not alter the over-all intent of this section of protecting information which is imparted to the commissioner as part of his studies and research in the public health area.

---

5. In 1963, the Legislature amended the statute to include, as purposes for the studies, not only the reduction of morbidity and mortality, but also the improvement of the quality of medical care within the State (L 1963, ch 326).

The Court of Appeals has said that "[i]f * * * the terms of a statute are plain and within the scope of legislative power, it declares itself and there is nothing left for interpretation." (*Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.,* 45 NY2d 471, 480.) "When words have a definite and precise meaning, courts should not go elsewhere in search of conjecture so as to restrict or extend that meaning". (*Matter of Erie County Agric. Soc. v Cluchey,* 40 NY2d 194, 200; see, also, *Meltzer v Koenigsberg,* 302 NY 523, 525.) Legislative intent must be first sought in the language of the statute. Where an act is expressed in unambiguous terms courts must enforce it to its letter to effectuate the literal and plain meaning of the words used. Courts should not extend such a statute beyond its express terms or the reasonable implications of its language (*Drelich v Kenlyn Homes,* 86 AD2d 648). Extrinsic circumstances should not be allowed to introduce a difficulty in the interpretation of plain language (see McKinney's Cons Laws of NY, Book 1, Statutes, § 111).

We hold that the provisions of section 206 (subd 1, par [j]) are plain and unambiguous and that there is no doubt that the information imparted to the commissioner in the questionnaires, which were prepared and disseminated by him, falls within the statutory proscription. The questionnaires are confidential and not subject to disclosure no matter how strong the showing of need or relevancy (see *Cirale v 80 Pine St. Corp.,* 35 NY2d 113). That is what the statute says. The prohibition against disclosure is absolute. There are no qualifications, and no role in the disclosure of the information is given to plaintiffs.

It follows then that plaintiffs' waiver of the physician-patient privilege by commencing the personal injury actions (see *Koump v Smith,* 25 NY2d 287) did not waive the prohibition against disclosure provided by section 206 (subd 1, par [j]). Likewise the limited authorizations executed by plaintiffs do not constitute a waiver of the privilege established by the section. This section, which was designed as a shield to protect the ability of the Department of Health to conduct essential studies, specifically prohibits the commissioner from violating the confidentiality attached to the records. Plaintiffs' waiver of the

physician-patient privilege is an inapposite consideration in the context of the statutory direction that mandates the duty of nondisclosure to the Commissioner of Health. The individual plaintiffs cannot waive a privilege which does not belong to them. Moreover, the authorizations which have been executed do not provide for the release of the totality of the data collected by the Department of Health (cf. *Morris v New York, Ontario & Western Ry. Co.,* 148 NY 88; *Permian Corp. v United States,* 665 F2d 1214). By allowing the release of the collected data to other governmental agencies only after redaction of names and addresses, the plaintiffs, even if they possessed the power of waiver, have not relinquished their promise of confidentiality secured by statute.

■ Arguably the same confidentiality and prohibition against disclosure would apply to the documents in the hands of the commissioner, other than the completed questionnaires, which the defendants seek to discover.[6] This assembled material, even though it was not supplied on forms prepared by the commissioner, was gathered from confidential sources or with the consent and authorization of the plaintiffs for studies and research. However, there is ample cause to deny disclosure of this data for other reasons.

Although it is claimed that the records include information pertaining to illnesses and conditions unrelated to the personal injuries alleged by the plaintiffs in their lawsuits for which they seek to recover damages, there seems to be little question that certain of the information sought by defendants is material and necessary to the preparation of their defense. This data, of course, may be helpful in identifying causal relationships between suspected risk factors and adverse health effects attributable to the al-

---

6. Although we need not consider this issue, there is a public interest privilege which attaches to confidential communications to public officers in the performance of their duties where the public interest requires that such confidential communications not be divulged (see *Cirale v 80 Pine St. Corp., supra*). This privilege appears to apply to the information sought by these defendants (see *Jones v State of New York,* 58 AD2d 736). Moreover, certain information appearing on birth records and fetal death certificates is not copied into local registers, is confidential and its release is not authorized (see Public Health Law, §§ 4173, 4174; 10 NYCRR 35.2 [d], 35.3).

leged exposure to Love Canal chemicals. The fact that section 206 (subd 1, par [j]) of the Public Health Law provides that the information in the hands of the commissioner shall not be admissible as evidence in any action in any court is not necessarily a bar to the discovery of this material (see *Harmon v Ford Motor Co.,* 89 AD2d 800, 801). The Department of Health is a nonparty to the litigation, however, and generally may not be required to provide disclosure unless a "court on motion determines that there are adequate special circumstances." (CPLR 3101, subd [a], par [4]). Although this section of the CPLR has been broadly construed (see *Kenford Co. v County of Erie,* 41 AD2d 586), the mere allegation that the information sought is "material and necessary" does not satisfy the requirement that adequate special circumstances be shown (*Cirale v 80 Pine St. Corp.,* 35 NY2d 113, 117, *supra*). "Nor is the bare assertion of special circumstances sufficient; there must be specific support for the claim" (*supra,* p 117).

This is not the case where a showing of hostility of a nonparty witness is offered to meet the special circumstances requirement or the case where a nonparty witness has primary information that will shed some light on the case. Here, the assembled information which defendants seek, other than the information imparted by the questionnaires, can be obtained from the source of the information, i.e., physicians, hospitals and plaintiffs, and through disclosure in the individual actions, including physical examinations if desired (see CPLR 3121). Defendants claim that they face an arduous task in assembling and reviewing the data and that it would be more convenient to obtain the materials from the Department of Health than from the plaintiffs' physicians and hospitals and other normal channels. This hardly constitutes a showing of special circumstances. While it may be more convenient to obtain this information from the assembled records of the Department of Health, rather than from the custodians of the records, the defendants are neither constrained nor prejudiced in their efforts to prepare for trial. Even if we were to view the convenience of these defendants as a special circumstance, in view of the assurances which were given to plaintiffs that the material would be kept confidential,

disclosure of the information requested would be more harmful to the interests of government than beneficial to the interests of the defendants seeking the information. Indeed, the Department of Health has expressed concern that if it were compelled to release these records "without consents" it would be in danger of losing its ability to acquire records in the future either voluntarily or pursuant to statutory reporting requirements, and that the release of this data would have a chilling effect on the ability of the Department of Health to regulate, investigate, protect and promote the health of the residents of New York State (see Public Health Law, § 201). The need of the litigant for information must be balanced "against the government's duty to inquire into and ascertain the facts * * * for the purpose of taking steps to prevent similar occurrences in the future." (*Cirale v 80 Pine St. Corp.*, *supra,* p 118.) Under the circumstances here the over-all public interest is better served by nondisclosure.

Accordingly, since the information imparted by the questionnaires is confidential, and the burden of establishing that special circumstances are present is upon defendants and the granting of such motion is within the discretion of the court (3A Weinstein-Korn-Miller, NY Civ Prac, par 3101.32), we hold that the disclosure sought by the defendants from the Department of Health was properly denied and, therefore, the order should be affirmed.

HANCOCK, JR., J. P., CALLAHAN, DENMAN and BOOMER, JJ., concur.

Order unanimously affirmed, with costs.