OPINION OF THE COURT
Harold Hyman, J.
The case definition of AIDS promulgated by the Center for Disease Control (CDC) for national reporting continues to include only the more severe manifestations of HTLV-III/LAV infection. CDC defines a case of AIDS for epidemiologic purposes as a syndrome in which a person has a reliably diagnosed opportunistic infection or malignancy at least moderately indicative of underlying cellular immuno-deficiency, where there is no known cause of the immuno-deficiency. Other persons infected with HTLV-III/LAV develop less specific or milder symptoms indicating a suppressed immune system, such as persistent swollen lymph glands, unexplained *400 fever and weight loss. These clinical and immunologic characteristics are referred to as "AIDS-related complex” (ARC). Perhaps approximately 10% of the adults who are infected with HTLV-III/LAV, as some studies suggest, will ever progress to ARC. A small percentage of ARC patients go on to develop a life-threatening opportunistic infection classifying them as having AIDS. One study followed 200 ARC patients over three years, of whom 30% converted to AIDS.
The majority of individuals who have been infected with the virus do not develop any symptoms, although many may reveal mild to moderate immune deficiency upon clinical examination. It is conservatively estimated that between 300,-000 and 1,000,000 persons in the United States have asymptomatic infection with the virus. In New York City, it is currently estimated that 350,000 to 400,000 adults are asymptomatic carriers (most of them people with one of the classic risk factors for AIDS), while the number of asymptomatic but infected school-aged children (5-18 years of age) ranges from 200 to 2,000. Although the risk of developing ARC or AIDS by people infected with the virus remains unknown, some laboratory studies suggest that an infected person poses the same if not potentially more significant risk in transmitting the virus to others based upon immunologic evidence that the virus is more easily recovered during the ARC and asymptomatic stages than with AIDS; this is attributed to the fact that the rapid replication of the virus in an AIDS victim will have already infected and thus destroyed a large proportion of the lymphocytes from the seminal body fluids associated with the documented and theoretical modes of transmission.
The incubation period for adults is thought at present to range from a few weeks to as long as seven years; children who are infected in útero or via transfusion during the neonatal period usually develop symptoms within 5 Vi to 13 months. Most of the pediatric patients in New York City who developed the full-blown syndrome died of their disease, on the average, nine months after the onset of an opportunistic infection.
I
In a joint statement issued on August 30, 1985 by Mayor Edward I. Koch, New York City Schools Chancellor Nathan Quinones, Board of Education President James F. Regan, and Health Commissioner Dr. David J. Sencer, a policy was an *401 nounced under which all children with AIDS would not be automatically excluded from the New York City public schools, but would be reviewed on a case-by-case basis to determine whether their health and development permitted them to attend school in an unrestricted setting. Thereafter, under the auspices of the New York City Department of Health, a four-member panel was established to review the condition of each school-aged child reported as having AIDS or suspected AIDS and to make recommendations as to the appropriate educational placement for that child. Pursuant to the panel’s report, the Commissioner of Health recommended to the Chancellor that one seven-year-old child (John/Jane Doe), who several years ago had been diagnosed as having AIDS, but who has remained well and done well in school for the past three years, should continue in school, and that the child’s identity should remain confidential. This recommendation was accepted by the Chancellor and Board of Education and a joint statement announcing the decision was issued on September 7, 1985, two days before the commencement of the school year.
That announcement was the impetus for the application to this court by petitioners, two local community school boards from district 27 and 29, and an individual, Samuel Granirer, who is president of one of the boards and the father of two children attending New York City public schools, for an order to show cause, a temporary restraining order and a permanent injunction prohibiting respondents from admitting the unidentified child with AIDS to any public school within New York City attended by students without AIDS. On September 9, 1985, the court denied petitioner’s application for a temporary restraining order, but set the case down for trial on September 12, 1985, on which date an amended petition was filed seeking a judgment, pursuant to CPLR article 78, requiring the expulsion of John/Jane Doe from school, as well as disclosure of both the child’s identity and the school the child is attending.
On September 13, 1985, the court granted a renewed motion to intervene by John/ Jane Doe, the child whose school attendance was challenged by petitioners, and on September 18, 1985, the court granted a motion by the President of the New York City School Board’s association to intervene as a petitioner.
During the five-week trial, the court heard testimony from 11 medical experts, including Health Commissioner David *402 Sencer and various physicians who explored the issues concerning AIDS, HTLV-III/LAV and related medical problems. In addition, Commissioner Sencer, Chancellor Quinones, and Dr. Polly Thomas, employed by the Department of Health as a pediatrician epidemiologist, specializing in AIDS and an appointed member of the panel, testified concerning their individual participation and the function and role of their respective agencies in developing and implementing the city’s policy regarding students with AIDS.
While the trial was in progress, Commissioner Sencer convened a second panel of seven distinguished physicians — four of whom had previously testified as principal witnesses to review John/Jane Doe’s status. On November 14, 1985, exactly one month after the trial concluded, the second medical panel reported that, after reviewing the medical facts in detail and extensively interviewing the child’s treating physician, they unanimously concluded that John/Jane Doe does not meet the CDC surveillance definition of AIDS, but has been infected with the HTLV-III/LAV virus and clinically evidences immune suppression. Thus, this child is no different from the estimated many school children who are infected with HTLV-III/LAV but who do not have AIDS and who are unknown to the health or school authorities.
Notwithstanding that such finding raises the specter that the issues to be determined here may have been rendered moot as it relates to the Doe child, the court will nonetheless entertain those issues, particularly since they are likely to recur, and are of sufficient public importance and interest. (See, e.g., Matter of Storar, 52 NY2d 363, 369-370.) This is not to suggest that this lower court views itself as having the legal stature or broad powers of review of a Court of Appeals, a tribunal from which guidance is enthusiastically awaited even in matters rendered academic by circumstance; nor does this court mean to suggest that the child in question served no apparent function in bringing important public issues to the forefront. The fact is that the decision not to expel John/Jane Doe from school ignited parental concern and served as the catalyst to opening the courthouse door to a review of the challenged governmental action. In turn, this singular court proceeding became the immediate focus of intense public interest and media attention, involving as it did highly emotional and controversial questions of civil rights, confidentiality, government, and school-aged children touched by one of the most publicized lethal infectious killers known to modern *403 medicine. Such circumstances more or less dictated that this court invoke the rarely utilized power to require a trial of the facts rather than resolve this CPLR article 78 proceeding on the papers alone. Indeed, from the outset, the parties and the court recognized an opportunity to conduct a broad-ranging, aggregative inquiry calculated to advance the public education about AIDS, the disease, and the legal and social issues concerning the exclusion from the regular classroom setting of children diagnosed as having AIDS or ARC or who remain asymptomatic carriers of the virus. In keeping with this well-intentioned purpose, the trial at times necessitated exploring matters not strictly relevant to this one child, examining the fundamental issues of authority and process under which the respondents reached their determinations concerning school children with AIDS and the rationality behind those decisions as established by the medical and scientific evidence presented in court.
IV
As with many other diseases before it, much of the understanding of the communicability of AIDS has come from the study of its epidemiology. At the trial, a number of distinguished physicians testified with respect to the distribution of the disease and the patterns of spread of the HTLV-III/LAV virus, relying upon the available epidemiologic information that has evolved since the classification of the disease as well as their professional experience in providing care to AIDS/ ARC adult and pediatric patients and studying the virus under controlled laboratory conditions. Testifying for the petitioners were Drs. Ayre Rubenstein, pediatrician and immunologist, Professor of Pediatrics, Albert Einstein Medical College; Jose Giron, Chief of Infectious Diseases, Flushing Hospital and Medical Center; and Lionel Resnick, virologist, National Institute of Health. Testifying for the respondents were Drs. Donald Armstrong, Director of Infectious Diseases, Memorial Sloan-Kettering Medical Center; Louis Z. Cooper, Chief of Pediatrics, St. Luke’s Roosevelt Hospital Center; and Margaret Hilgartner, pediatric hematologist and oncologist, Director of Hemophiliac Clinic, New York Hospital, Cornell Medical Center. Also offering medical testimony on behalf of the respondents were Commissioner Sencer and Dr. Pauline Thomas, themselves holding impressive credentials in, respectively, the epidemiology of AIDS and public health service.
Considering that much of the expert testimony over the five- *404 week trial was fairly uniform on the risk factors and modes of transmission associated with the AIDS virus, the court has chosen to compílate only the most salient facts necessary to a comprehensive understanding of that subject.
Most reported AIDS cases may be separated into groups based on one or more well-defined risk factors: homosexual and bisexual men with multiple sexual partners; intravenous (IV) drug abusers with no history of male homosexual activity who share needles and other drug paraphernalia; recipients of infected blood and blood products (e.g., hemophiliacs and persons who had blood transfusions); infants born to infected mothers; and heterosexual partners of persons at risk for AIDS.[1] Among the 4,531 reported cases of AIDS in New York City that have been fully investigated, 1% did not fall into one of the identified risk groups for AIDS. Those familiar with the epidemiologic considerations explain the 1% figure by the fact that these noncharacteristic victims either deny any AIDS risk behavior (homosexuality, IV drug use, visits to prostitutes), or are unaware that they themselves have been the sexual partner of risk group members. Although the total number of cases in each patient group has increased substantially, the relative proportion of cases within each group has remained remarkably stable over time.
AIDS has become established primarily as a sexually transmitted disease that can also be communicated through contaminated blood or blood products. HTLV-III/LAV has been isolated from bodily fluids such as semen, blood, saliva and tears. The AIDS virus has been found in highest concentrations in blood and semen, and in lower concentrations in saliva and tears. Despite positive cultures from a variety of body fluids of infected persons, there is no concrete epidemiological evidence to date that the virus has been transmitted through contact with the saliva or tears of infected persons, thus leading some physicians to conclude that there probably *405 needs to be a substantial quantity of virus particles to transmit the virus. Attempts to isolate the virus from urine, vomit, stool or cervical and vaginal secretions are in progress, although some doctors expressed the opinion that vomit is not a viable medium for transmitting the virus since the virus would be destroyed by the acid pH of the stomach and its contents.
HTLV-III/LAV, as with the other human retroviral agents, is a relatively fragile virus and is of a lower order of infectivity than, for example, hepatitis B which is much more stable. The virus is inactivated by disinfectants, such as ordinary household bleach (diluted 1 part bleach to 9 parts water) and 70% alcohol, or by moderate heat.
Reinforced by the total absence of documented cases of HTLV-III/LAV having been transmitted in any way other than by sexual intercourse, by injection of contaminated blood or blood products, including needle sharing, or by an infected mother to her child before or during birth,[2] the experts unanimously agreed that the virus is not transmitted by casual interpersonal contact or airborne spread, such as breathing, sneezing, coughing, shaking hands or hugging. After almost five years of experience, the surveillance data collected by local and State departments of health and forwarded to the CDC, as well as epidemiologic studies of families that include AIDS patients and of health-care workers who have been exposed to AIDS patients, speak strongly against transmission of AIDS through causal (nonsexual) contact.
Other than the sexual partners of HTLV-III/LAV infected patients and infants born to infected mothers, none of the family members of the thousands of AIDS patients reported to the CDC have been reported to have AIDS. Over 500 family or household members have been investigated who lived together with persons who were infected with HTLV-III/LAV. Approximately half of those studied were children. Those family members were more than likely exposed to the saliva of infected patients and, to some extent a manifestation of the impoverished and unhygienic environment, had occasion to share beds, food, toothbrushes, baby bottles, towels and eating and drinking utensils with them, often without knowledge for some time that an infected family member was in their midst. *406 The serologic testing revealed no finding of transmission of the virus by means other than sexual contact, perinatally or blood transfusions. Significantly, in one study of families of children with transfusion-acquired HTLV-III/LAV infection, none of the 50 family members had developed AIDS or were seropositive, including 10 household members under 5 years of age, 9 contacts of 6-18 years of age and 31 adults, including 15 mothers.[3]
There also have been no confirmed occupation-related cases of AIDS in health-care workers in the United States. Some 1,758 health-care workers who have cared for AIDS patients have participated in studies to determine the potential for occupational transmission of HTLV-III/LAV through parenteral and mucosal routes; many of these workers have sustained accidental needle-stick injuries. Of the 26 who were found to be positive for HTLV-III/LAV, all but 3 of these persons belonged to a recognized high-risk group. For 1 of these 3 health-care workers, epidemiologic information was not available. The other 2 both experienced needle-stick injuries but denied any AIDS risk behaviors. CDC has noted, however, that in neither of those 2 cases was a preexposure blood sample taken to verify that the infection had not occurred prior to their needle-stick injuries. In addition, the case involving the female health-care worker from New York City was not fully investigated, according to Dr. Rand Stoneburner, Director of the Health Department’s AIDS Epidemiologic Surveillance Unit, who at the behest of the CDC in late July 1985 attempted without success to conduct a further interview of the patient regarding her sexual partner; the second case involving a male laboratory worker revealed no evidence that he had been exposed to HTLV-III/LAV-infected blood. Finally, the reported case from England of a nurse contracting AIDS involved not a mere needle-stick injury, but rather a puncture *407 which involved an "injection” of blood from an AIDS patient into her hand.
Although the present epidemiological and virological information does not support casual contagion through the day-today activities or contact in the home, school, day-care or foster-care setting, the presence of HTLV-III/LAV in saliva has nevertheless raised parental concern about the possible transmission of the virus through biting.
In addressing the issue raised by petitioners as to the risk of HTLV-III/LAV transmission through a child with AIDS biting another child or teacher, the opinions expressed by the medical experts on all sides of the case narrowly ranged from the seemingly conservative views of Drs. Giron and Rubenstein (probably low; certainly possible; cannot give complete assurances) to the more confident judgments of respondents’ witnesses (no danger; beyond remote possibility; highly, highly improbable; highly unlikely; not a risk of transmission). The near unanimity of opinion that biting is an unlikely route of HTLV-III/LAV transmission in the classroom setting is premised upon the epidemiologic data indicating no evidence that saliva has ever been a means of transmission, even among household members exposed to the saliva of infected persons; the "extremely low” concentration of the virus in saliva as suggested by the infrequency in culturing the virus from the saliva of persons with AIDS; the minimal capacity of younger children to penetrate the skin to the point where enough virus particles could enter the system of the bitten child; and the relative ease in destroying the virus through the same precautions as are taken in the management of any human bite, namely, careful washing of the wound with soap and water followed by alcohol.
Since the transmission of the virus appears to occur by direct blood-to-blood contact, there was considerable testimony at trial as to whether HTLV-III can be transmitted in a classroom setting through blood from an injured child with AIDS getting into an open cut of another child or teacher.
It is undisputed that the mere presence of HTLV-III/LAV in blood does not mean that it can be easily transmitted by external blood-to-skin contact. Most of the physicians’ testimony was addressed to the subject of the so-called "theoretical risk” of transmitting AIDS through exposure of open skin lesions or mucous membranes to blood of an infected child during a fight, as a result of a nosebleed, or even from the *408 childhood practice of becoming "blood brothers/sisters”. Some doctors expressed skepticism that a theoretical potential for transmission is likely inasmuch as the epidemiologic studies of health-care workers demonstrate the difficulty in transmitting HTLV-III/LAV even where there is exposure to infected blood from needle-stick injuries; indeed, these studies support the conclusion reached by several doctors that it would probably take a large amount of blood with a large quantity of virus particles entering into the bloodstream to transmit the disease. Several doctors dismissed the risk of transmission posed by a mixing of blood as the result of a school fight as "generally improbable”; "wild speculation”; "extremely, highly improbable”; and "practically nonexistent”. Dr. Hilgartner, a hematologist, further explained that if blood from one person were to drip on another person who had a fresh cut in the skin, the degree of commingling of blood would be extremely small because the healing process in which a clot forms, with fibroblast sealing the cut, creates a natural barrier to prevent any virus from entering.
Whatever minimal theoretical risk exists, the experts substantially agree that all blood spills and bleeding wounds should be treated with care regardless of whether children with AIDS/ARC are attending because there are other blood-borne illnesses that may be transmitted, some of which (such as hepatitis B) are considered more contagious than HTLVIII/LAV, and there may be asymptomatic carriers of HTLVIII/LAV present. Thus, the routine precautions to deal with the AIDS virus that have been recommended by the experts, as well as the CDC, closely follow those used with the hepatitis B virus infection: good handwashing with soap and water, followed by application of alcohol; prompt cleaning of soiled surfaces with disinfectants, such as household bleach diluted 1 part bleach to 9 parts water, preferably with gloved hands; avoiding exposure to open skin lesions or mucous membranes by covering bleeding or oozing cuts or abrasions whenever possible by a gauze dressing or bandage.
V
The petitioners rely on various provisions of the New York City Health Code to support their contention that the Commissioner of Health and Chancellor of the Board of Education are required by law to exclude any AIDS/ARC/HTLV *409 III child from the public school system. Health Code § 11.67 prohibits the intentional or negligent spread of disease by persons who are "cases or carriers of communicable disease” (emphasis added). Health Code § 45.17 (b) states, in relevant part: "The person in charge of the * * * school or children’s institution shall isolate cases and carriers of communicable disease and provide facilities for their isolation pursuant to section 11.57.” (Emphasis added.) Similarly, Health Code §49.15 (d) mandates the exclusion of any child from the elementary and junior high schools as well as public and private high schools "who is a case, contact or carrier of communicable disease when required to be isolated or excluded by Article 11 of this Code” (emphasis added). Although all the foregoing regulations relate to the control of "communicable disease”, in fact, the term "communicable disease” is not defined at all in the Health Code. Instead, each disease for which special precautions must be taken, such as isolation and exclusion, is treated separately under article 11. For instance, specific restrictions apply to cases and contacts of chicken pox (Health Code § 11.13), diphtheria (§ 11.19), infectious hepatitis (§ 11.25), measles (§ 11.29), and small pox (§ 11.43). (See, Health Code §§ 11.11-11.55.) Yet, article 11 does not treat AIDS as a communicable disease or contain any specific precautions or restrictions relating to AIDS cases, carriers or contacts. At best, the regulations of the city treat AIDS as reportable, but not communicable. While AIDS does not appear on the general list of diseases and conditions reportable to the Department as set forth in Health Code § 11.03, cases or suspected cases of AIDS are reportable under a special section (Health Code § 11.07, as amended Sept. 26, 1983) that accords such case reports and records confidentiality. The fact that AIDS is "reportable” does not mean, however, that it has been classified as "communicable”. For example, as respondents correctly point out, falls from windows and instances of food poisoning are reportable (Health Code § 11.03), but certainly are not communicable. Thus, since AIDS is nowhere defined or classified as a communicable disease, the health regulations of the City of New York relied upon by petitioners are all inapplicable.
At the State level, the power rests with the Public Health Council to "designate [in Sanitary Code] the communicable diseases which are dangerous to the public health” (Public *410 Health Law § 255 [5] [h]).[4] The statute defines the word "communicable” as an "infectious, contagious or communicable disease” (Public Health Law § 2 [1] [l]). While the Public Health Council has designated some 42 diseases as "infectious, contagious or communicable” (10 NYCRR 2.1 [a]), it has not included AIDS among the list of such diseases. Thus, despite the State Public Health Council having addressed the AIDS issue by emergency measures making cases or suspected cases of AIDS reportable to the State Department of Health on a strictly confidential basis (10 NYCRR 24.2, filed June 21, 1983, eif Oct. 6, 1983), and more recently, authorizing the closing of any bars, clubs and bathhouses in which "high risk sexual activity takes place” (10 NYCRR 24-2.2, filed Oct. 25, 1985, eff Oct. 25, 1985), it has apparently declined to exercise its statutory power to amend the sanitary regulations (Public Health Law §§ 220, 225), to include AIDS on the list of communicable diseases.
Here too, the fact that AIDS is reportable does not classify it as a "communicable” or "infectious” or "contagious” disease. In any event, to the extent the amended petition relies on State Education Law § 906, which requires exclusion of pupils with a "contagious or infectious disease reportable under the public health law”, such reliance is misplaced since that statute is inapplicable to the City of New York (see, Education Law § 901).
Thus, petitioners have failed to demonstrate that respondents were required by law to exclude AIDS children from the classroom. In fact, the State Public Health Council and State Education Department addressed this very issue and concluded: "For most infected school-aged children, the benefits of an unrestricted setting outweigh the risks of their acquiring potentially harmful infections in the setting and the apparent nonexistent risk of transmission of HTLV-III/LAV. These children should be allowed to attend school and aftér-school day-care in an unrestricted setting.”
Respondent Sencer concedes that under his broad power *411 and discretion to protect the public health and to prevent the spread of disease (NY City Charter § 556; Health Code § 3.01), he has the discretionary authority to conclude, as petitioners strongly urge, that AIDS is communicable in the classroom setting, or that a child with AIDS in the classroom would promote the spread of the disease, requiring exclusion of that child from school. His refusal to exercise that discretion in that direction must be examined against the record and the standards of review established by law.
Apart from the general body of medical knowledge concerning AIDS, as previously discussed, the CDC, New York State and other States, and all but one of the expert witnesses at trial agree with the policy of the Commissioner not to exclude children with AIDS from school unless their physical, neurological, developmental or behavioral condition makes it necessary for them to be educated in a more restricted setting. Although Drs. Giron and Rubenstein qualified their opinions with the condition that adequate precautions be taken, they as well as the expert witnesses called by respondents, concluded that children with AIDS should not automatically be excluded from school. That conclusion is consistent with the epidemiological evidence, including the family and health-care worker studies, which show that there is essentially no risk of transmission of HTLV-III/LAV in the classroom setting.
The CDC, New York and other States that have issued guidelines and policy recommendations similarly conclude that children with AIDS should not, absent exceptional circumstances, be excluded from school.
The CDC’s recommendations provide, in pertinent part: "2. For most infected school-aged children, the benefit of an unrestricted setting would outweigh the risks of their acquiring potentially harmful infections in the setting and the apparent nonexistent risk of transmission of HTLV-III/LAV. These children should be allowed to attend school and after-school day-care and to be placed in a foster home in an unrestricted setting.” The Connecticut guidelines provide: "2. As a general rule, a child with AIDS/ARC should be allowed to attend school in a regular classroom setting with the approval of the child’s physician and should be considered eligible for all rights, privileges and services provided by law and local policy of each school district.” And the New Jersey guidelines provide:
"1. Children entering grades K through 12 with AIDS/ARC *412 or HTLV-III antibody shall not be excluded from attending school unless the following exceptional conditions are evident:
"a. The student is not toilet-trained or is incontinent, or otherwise is unable to control drooling.
"b. Is unusually physically aggressive, with a documented history of biting or harming others.”
Taking a more conservative approach, the only expert witness to conclude that no children with AIDS should be permitted in school was Dr. Resnick, who was not an epidemiologist, had done no research on the issue of the transmissibility of HTLV-III/LAV, and conceded his lack of familiarity with the findings derived from the studies of family members and health-care workers. This disagreement with the CDC and epidemiologists, therefore, was not based on any evidence that HTLV-III/LAV could be transmitted in the classroom setting, but only on what he described as a "philosophical difference” as to the sufficiency of the data "at this moment in time”.
With respect to petitioners’ implication that the CDC’s reference to "biting” and "uncoverable oozing lesions” reflect a real concern by the CDC for the risks of HTLV-III/LAV transmission in the school setting, it would be misleading to promote such a notion since the CDC’s guidelines make clear that the "theoretical potential” for transmission by these means among younger children and some neurologically handicapped children derives from experience "with other communicable diseases”.
Throughout this case, petitioners focused their point of attack upon the reluctance of the medical experts to unequivocally state with certainty that HTLV-III/LAV cannot be transmitted except through previously identified routes of transmission. The testimony reflects, however, that it is not in the nature of medical science to be governed by a "no risk” standard.
Understandably, the public, not recognizing the underlying medical tradition, is suspicious of the seeming uncertainty. Yet, the fact that some lay people, both learned and unlearned, and some physicians of great skill and repute, may differ as to the efficacy and necessity for excluding from the regular classroom setting the HTLV-III/LAV-infected child who otherwise demonstrates a normal physical, neurological, developmental and behavioral condition, is not reason enough to declare the Commissioner’s policy to be without consideration or in disregard of the facts. As stated in Matter of *413 Viemeister (179 NY 235, 241): "The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by every one. The possibility that the belief may be wrong and that science may yet show it to be wrong is not conclusive”.
Since "the apparent nonexistent risk of transmission of HTLV-III/LAV” in the school setting finds strong support in the epidemiological data accumulated over the five years of experience with this disease, as exhaustively explored on the record, and because the automatic exclusion of children with AIDS from the regular classroom would effect a purpose having no adequate connection with the public health, safety or welfare, it would usurp the function of the Commissioner of Health if this court adjudged, as a matter of law, that the nonexclusion policy was arbitrary and capricious or an abuse of discretion simply because in the court of public opinion, that particular policy was — perhaps, or possibly — not the best choice. Although this court certainly empathizes with the fears and concerns of parents for the health and welfare of their children within the school setting, at the same time it is duty bound to objectively evaluate the issue of automatic exclusion according to the evidence gathered and not be influenced by unsubstantiated fears of catastrophe. (See, e.g., Matter of Jackson v New York State Urban Dev. Corp., 110 AD2d 304.)
 Finally, automatic exclusion from school of all children with AIDS would violate their rights under the Rehabilitation Act (see, 29 USC § 794) and to equal protection of the laws.
Given that the question of excluding children with AIDS from school has only recently generated legal activity, it is not at all unusual that the best available legal authority is found in Federal appellate decisions concerning other communicable diseases (hepatitis B).[5] Six years ago, the Federal courts prevented the New York City School Board from limiting the school attendance of some 50 retarded children infected with hepatitis B. (New York State Assn. for Retarded Children v Carey, 466 F Supp 479 [EDNY 1978], affd 612 F2d 644 [2d Cir 1979].)
*414 The District Court held, in two separate opinions, that either exclusion or isolation of these students would violate their rights under the Rehabilitation Act, the Education of the Handicapped Act, the New York Education Law, and the equal protection clause of the US Constitution 14th Amendment. (New York State Assn. for Retarded Children v Carey, 466 F Supp 479 [EDNY 1978], supra; New York State Assn. for Retarded Children v Carey, 466 F Supp 487 [EDNY 1979].)
In affirming, the Court of Appeals for the Second Circuit stated (p 649): "The New York City Board of Education is a recipient of federal funds. The children in this suit are clearly handicapped within the meaning of Section 706 (7) [Rehabilitation Act]. They were excluded from regular public school classes and activities 'solely by reason of their handicap,’ since only mentally retarded youngsters who were carriers of the hepatitis B antigen were isolated; no effort was made to identify and exclude normal children who were carriers. Section 504 is thus fully applicable to this case.”
Section 504 of the Rehabilitation Act of 1973 (29 USC § 794) provides, inter alia: "No otherwise qualified handicapped individual in the United States, as defined in section [29 USC § 706 (7)] shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance”. A handicapped individual is: "any person who (i) has a physical or mental impairment which substantially limits one or more of such person’s major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.” (29 USC §706 [7] [B].)
The regulations that have been promulgated under the Rehabilitation Act define "physical or mental impairment” to mean "(A) any physiological disorder or condition * * * affecting one or more of the following body systems * * * hemic and lymphatic” (34 CFR 104.3 [j] [2] [i] [A]). Since HTLV-III/ LAV destroys certain lymphocytes, a person with AIDS clearly has such a "physical impairment”. Further, the regulations define the phrase "is regarded as having an impairment” to mean any person who: "(C) has none of the impairments defined in * * * this section but is treated by a recipient as having such an impairment.” (34 CFR 104.3 [j] [2] [iv] [C].) If students with AIDS were automatically excluded from school, they would clearly be "treated * * * as having such an impairment” by the Board of Education, a "recipient” of *415 Federal funds. Accordingly, children with AIDS are handicapped within the meaning of the Rehabilitation Act. (See also, People v 49 W. 12 St. Tenants Corp., NYLJ, Oct. 17, 1983, p 1, col 1 [Sup Ct, NY County].)
The Rehabilitation Act would equally apply to a child such as John/Jane Doe who, by evidencing past infection with HTLV-III/LAV, "has a history of, or has been misclassified as having, a * * * physical impairment that substantially limits one or more major life activities” (34 CFR 104.3 [j] [2] [iii]), or, by exclusion, would be "treated * * * as having such an impairment.” (34 CFR 104.3 [j] [2] [iv] [C].)
When one considers that several medical experts described the hepatitis B virus as "far more contagious” than the AIDS virus, the failure of proof in this case is even greater than that experienced by the Board of Education in Carey (supra): petitioners not only failed to establish that the transmission of HTLV-III/LAV in the classroom setting is anything more than a remote theoretical possibility and that the Doe child engaged in any form of behavior that poses even a theoretical risk, their own witnesses did not dispute the testimony, as well as the Federal and State view, that any theoretical risk can be substantially reduced by routine precautions. Accordingly, if the policy were to have been the exclusion of children diagnosed as having AIDS while not excluding children with ARC or those merely infected with the HTLV-III/LAV virus, it would constitute discrimination under section 504 of the Rehabilitation Act (29 USC § 794). Thus, the policy of nonexclusion would appear to have been correct. Since there is no prima facie showing of discrimination here, the burden is not on the agencies to validate their policy.
This ultimately brings us to the issue of whether the exclusion of known children with AIDS without imposing a similar policy on children with ARC or those who are asymptomatic carriers of HTLV-III/LAV would constitute a violation of the equal protection clause of the 14th Amendment.
With the recent medical finding by the second panel that the Doe child "does not at this time meet the CDC surveillance definition of AIDS, but has been infected with the HTLV-III virus * * * [and] has clinical and laboratory evidence that put him/her in a category of immune suppression”, the child’s attorney asserts that to impair Doe’s right to an education would violate his/her right of equal protection of the laws.
*416 Public education is not a fundamental "right” granted to individuals by the United States Constitution. (San Antonio Ind. School Dist. v Rodriguez, 411 US 1, 35 [1973].) However, once the State, like New York, chooses to provide public education (NY Const, art 11, § 1), the right to an education "must be made available to all on equal terms” (Brown v Board of Educ., 347 US 483, 493 [1954]). While the denial of attending the school of one’s choosing is not tantamount to a denial of a right to education (Johnpoll v Elias, 513 F Supp 430, 432 [EDNY]), the legal system recognizes educations’ impact upon the "social * * * intellectual, and psychological well-being” of the child (Plyer v Doe, 457 US 202, 222 [1982]), and the benefits the child derives from the socialization process in the regular classroom. (Hairston v Drosick, 423 F Supp 180, 183 [SD W Va 1976].)
Absent any rational basis for petitioner’s proposed exclusion of only known AIDS cases or carriers of the virus, without imposing such exclusion in the case of ARC patients or asymptomatic carriers who are as likely to present a risk of contagion because they too are infected with HTLV-III/LAV, such a proposal must be deemed a denial of the equal protection of the laws. In this respect, the parallels between this case and Carey (supra) are striking.
In Carey (supra), as here, the evidence established that there were substantial numbers of children in the school system who were infected with the virus and who were not being excluded or isolated. The District Court held that the constitutionality of the Board’s proposal could not be sustained because "[a]mong the approximately 1,000,000 children in New York City’s public school system, no other group is tested for hepatitis B, nor is any action planned to identify or take special precautions with respect to any hepatitis B carriers other than those who are retarded.” (New York State Assn. for Retarded Children v Carey, 466 F Supp, at p 504.) Accordingly, the District Court concluded, the segregation of retarded hepatitis B carriers lacked any rational basis and violated their equal protection rights. Similarly, in this case, an estimated 500,000 persons, of whom 200 to 2,000 are school-aged children, in New York City, are asymptomatic carriers of HTLV-III/LAV; these persons are as likely to transmit the virus as a victim of AIDS. Because of the shortcomings of the antibody test and the social implications of a mandatory screening program, none of the medical experts, including petitioner’s expert virologist, Dr. Resnick, recommended blood *417 testing of all New York City school-aged children for the virus to determine whether they should be in school. In addition, not only is there no reporting requirement for ARC or asymptomatic carriers, based upon the lack of any evidence that more than a remote theoretical possibility of transmittal exists within the school setting, as well as the recommendation by both the Centers for Disease Control (recommendation 9) and State Department of Health (recommendation 1) that mandatory screening as a condition for school entry "is not warranted based on available data”, there is no program for testing and identifying students, teachers, cafeteria workers or other school personnel infected with the virus, nor is there a requirement that such persons be reported to the Health Department.
It is difficult to conceive of a rational justification imposing a discriminatory burden on known carriers of HTLV-III/ LAV while untested and unidentified carriers still remain in the classroom where they pose the same theoretical (though undocumented) risks of transmitting the virus to normal children.
VII
The guidelines issued by the CDC and the New York State Department of Health, the policy of the New York State Education Department, and the expert witnesses on both sides indorse the view that children with AIDS should be permitted to attend school after a case-by-case review to determine whether circumstances exist that would tend to pose increased risks to others or require special precautions.
Both the CDC (recommendation 1) and the State Health Department (recommendation 2) recommend: "Decisions regarding the type of educational and care setting for HTLV-III/ LAV-infected children should be based on the behavior, neurologic development, and physical condition of the child and the expected type of interaction with others in that setting. These decisions are best made using the team approach including the child’s physician, public health personnel, the child’s parent or guardian, and personnel associated with the proposed care or educational setting. In each case, risks and benefits to both the infected child and to others in the setting should be weighed.” (Emphasis added.) Similarly, the policy of the State Education Department, as stated by Commissioner Gordon M. Ambach on September 4, 1985, is that: "no child be excluded *418 from school attendance solely because the youngster has been diagnosed as infected with AIDS. Instead, school authorities should review each case individually with the appropriate medical personnel and the child’s parents to determine whether the youngster can be accommodated in a normal education setting without undue risk to himself or others.”
The court begins by addressing petitioners’ contention that the case-by-case inquiry of children suspected of having AIDS should have been conducted by referral to the local school district’s Committee on the Handicapped rather than through the device of an advisory panel appointed by respondent Sencer. The Education of the Handicapped Act (20 USC § 1400 et seq.) was enacted in 1975 to "assure that all handicapped children have available to them * * * a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, [and] to assist States and localities to provide for the education of all handicapped children” (20 USC § 1400 [c]). A similar concern was expressed by the New York State Legislature in enacting legislation relating to handicapped children. (Education Law § 4401 et seq.) In New York, the mechanism for securing appropriate special education programs and services for handicapped students is by a referral to the local district’s Committee on the Handicapped, a multidisciplinary team established in accordance with the provisions of Education Law § 4402. The pivotal question is whether a child diagnosed as having AIDS would fall within the definition of a "handicapped child”. Evidently, the term is more narrowly defined in the Education of the Handicapped Act than the Rehabilitation Act. Under the Education of the Handicapped Act, the term includes those children evaluated as being health impaired who, because of those impairments, need special education and related services. (20 USC § 1401 [a] [1].) "Health impaired” is defined as "having limited strength, vitality or alertness due to chronic or acute health problems * * * which adversely affect a child’s educational performance.” (34 CFR 300.5 [b] [7] [ii].) Education Law §4401 (1) defines a " 'child with a handicapping condition’ ” as one "who, because of mental, physical or emotional reasons can receive appropriate educational opportunities from special services and programs”. Thus, while a child with AIDS could become handicapped as a result of deterioration in his or her condition, the evidence clearly supports the determination *419 that such children are not handicapped for purposes of referral to a Committee on the Handicapped merely because they have AIDS/ARC or are infected with the HTLV-III/LAV virus.
In this court’s view, there are several reasons why it seems more appropriate not to rely exclusively on the underlying data furnished by the child’s physician and parent. First, because infection with HTLV-III/LAV may result in a spectrum of medical conditions of differing severity, even the available evaluative information of a physician experienced with AIDS may not indicate a clear diagnosis in order for the record to support an appropriate determination. Second, given the relatively few treating physicians with background, experience, and expertise in this field, the panel should have the responsibility to independently determine the validity of the examination results obtained by a treating physician before it adopts them, rather than merely defer to the evaluation data from the physician or parent. Third, the panel should invite the appropriate professionals most familiar with the child’s medical history to attend any meeting concerning the appropriate placement for such a child. Fourth, the panel should strongly consider, where appropriate, having the child independently evaluated for neurological and psychological disorders. Finally, an adversary-type proceeding, similar to that employed in New Jersey, might serve the worthwhile purpose of bringing the local school district into the evaluation process.[6]
In addition, since the panel is ultimately determining the educational placement of the child, it must adhere to the minimum procedural safeguards required by the due process clause. (Cf. Education Law § 4404; 8 NYCRR 200.5; Johnpoll v Elias, 513 F Supp 430, 431, supra; see generally, Goss v Lopez, 419 US 565, 574 [1975].)
VIII
Cases of AIDS are reported to the Department pursuant to the reporting requirements set forth in the State Sanitary Code (10 NYCRR part 24) § 24-1.1 which provides in pertinent *420 part: "All cases or suspected cases of Acquired Immune Deficiency Syndrome (AIDS) shall be reported to the Commissioner of Health, by city, county and district health officers, physicians, hospital administrators, laboratories or persons in charge of State institutions.” Section 24-2.2 of that regulation requires that "[sjuch reports and additional information shall be kept confidential, as required by Public Health Law, section 206 (1) (¡X”
Public Health Law § 206 (1) (j) provides in pertinent part:
"The Commissioner shall * * *
"cause to be made such scientific studies and research which have for their purpose the reduction of morbidity and mortality * * * In conducting such studies and research, the commissioner is authorized to receive reports on forms prepared by him * * * Such information when received by the commissioner * * * shall be kept confidential and shall be used solely for the purposes of medical or scientific research or the improvement of the quality of medical care through the conduction of medical audits. ” (Emphasis added.)
The Legislature in enacting Public Health Law § 206 (1) (j) created a comprehensive and impervious shield to protect the ability of the Health Department to conduct essential scientific research and medical audits. In explicit language, the statute provided that information received from participants in health studies or audits would be kept confidential, even from judicial process. This statutory commitment of confidentiality is designed to effectuate two important public policies of the State of New York: (1) protection of the privacy of its citizens and (2) creation of an atmosphere of trust to enable the Health Department to gather the kind of complete health data it needs to carry out its statutory purposes. (Matter of Love Canal, 112 Misc 2d 861, 863, affd 92 AD2d 416.)
The statute provides for no exception to these restraints. In Matter of Love Canal (92 AD2d 416, supra), the court stated clearly the unqualified nature of the confidentiality provision’s prohibition against disclosure.
Special Term held that Public Health Law § 206 (1) (j) prohibited disclosure of the records in the possession of the Department of Health. (Matter of Love Canal, 112 Misc 2d 861, supra.) In affirming, the Fourth Department stated (pp 422-423): "This section, which was designed as a shield to protect the ability of the Department of Health to conduct essential studies, specifically prohibits the commissioner from *421 violating the confidentiality attached to the records. Plaintiffs’ waiver of the physician-patient privilege is an inapposite consideration in the context of the statutory direction that mandates the duty of nondisclosure to the Commissioner of Health. The individual plaintiffs cannot waive a privilege which does not belong to them. ” (Emphasis added.)
To the extent there may be any exception to the absolute confidentiality protection of Public Health Law § 206 (1) (j), such exception has been unequivocally limited to reports or records other than information imparted to the Commissioner of Health in connection with research or scientific studies designed to reduce "morbidity and mortality”. New York City Health Code § 11.07 (Confidentiality of Reports and Records), as amended, thus provides in pertinent part:
"(a) Reports and records of cases of Acquired Immune Deficiency Syndrome (AIDS) * * * and records of clinical or laboratory examination shall not be subject to subpoena or to inspection by persons other than authorized personnel of the Department except as follows * * *
"(2) Such reports and records relating to Acquired Immune Deficiency Syndrome (AIDS) * * * may be disclosed or inspected upon submission to the Department * * * of a written consent * * * [i]n * * * cases involving such reports and records of minor patients * * * signed by the parent or lawful guardian of the child. Under no circumstances shall epidemiological information relating to the control of Acquired Immune Deficiency Syndrome * * * be deemed reports or records under this section so as to subject said information to disclosure with or without consent. ” (Emphasis added.)
The confidentiality provided by Public Health Law § 206 (1) (j) guards the information gathered by the State and local public health agencies in carrying out their surveillance task. By this task, such agencies are charged with the responsibility of monitoring the progress of diseases which may be highly contagious or of epidemic proportions.
This is not the only task of public health agencies and may provide only a small portion of the data and records which they accumulated. (See, e.g, Health Code § 49.17 [School Medical Records].) Public Health Law § 206 (1) (j), however, provides absolute confidentiality to the surveillance data and does not deal with the records of the other tasks. The other records of the New York City Department of Health are guarded by the more limited confidentiality of New York City Health *422 Code § 11.07, and thus available for release upon the written consent of the parent or guardian of the minor child. It is noteworthy, however, that this section of the Health Code is consistent with Public Health Law § 206 to the extent that it specifically exempts "epidemiological information” from disclosure with or without consent.
Respondent Sencer has never denied the fact that the information presented to the review by panels concerning identified school-aged children with AIDS, including the child who is now attending school, was obtained from the Department of Health through the reports made to its AIDS Epidemiologic Surveillance Unit. By his broad use of Public Health Law § 206, utilizing the AIDS surveillance information to identify individuals for panel review, Dr. Sencer came dangerously close to compromising the very data which that section was intended to protect. The data may be used for statistical purposes or for research and study of the epidemiology of the disease. Here, the data, in part, was revealed to both panels for determining the fitness of an individual to attend school. This appears to be a violation of the statute and thus a breach of confidentiality. If this be correct, then any additional data collected by the panels would not be surveillance data and not protected by section 206. It might be argued that the problem would never come about as the data would never be revealed. This would only be true if Dr. Sencer meant never to act on a possible committee recommendation that a teacher or some other school official be informed in a given case. This would render the panels a fraud. If on the other hand, Dr. Sencer intended affirmatively to act on such recommendation, then he intended a clear violation of section 206. Thus, the Commissioner’s use of section 206 to create a wall of secrecy may have opened a Pandora’s Box.
What, then, is the solution to this question? Clearly, the dictatorial imposition of a universal answer under the guise of statutory compliance is not it. The CDC guidelines suggest case-by-case review of each child which must be sensitive to all the needs of the child including confidentiality. This is one of many possibilities. Such individual case review raises the additional question of how the'identity of such individuals would be ascertained. The use of surveillance data is not a permitted vehicle. While the Legislature could change this restriction, the court would discourage such action as it would adversely impact on the important task of tracking the history of certain diseases. Yet, whatever method for referral is *423 eventually chosen, the decision as to whether and to whom the identity of the child should be revealed will ultimately reside with the review panel. The answer to these questions is not easy and the court will not succumb to the quick fix of choosing one.
Under the Constitution of this State, the resolution of such public policy questions must be the responsibility of the legislative and executive officials addressing it in an open forum.

. Most of these classified heterosexual contact AIDS cases are women who are the sexual partners of male intravenous drug users. While some male AIDS patients with no identified risk have given a history of multiple heterosexual contacts with female prostitutes, additional evidence for female to male transmission of HTLV-III/LAV in the United States is still being sought. Critics argue that men are not apt to admit past homosexual encounters or drug use; they further challenge the epidemiological data underlying one recent study suggesting female prostitutes in Central Africa are a high-risk group for transmitting HTLV-III/LAV infection and, in any event, the relevance of such a study to the spread of the infection among the heterosexual population in the United States.

. There is also one reported case outside the United States of transmission via breast feeding.

. Consistent with the epidemiologic data and family studies indicating that casual transmission of HTLV-III/LAV does not occur are findings recently published in the New England Journal of Medicine demonstrating the infrequent isolation of HTLV-III/LAV virus from the saliva specimens of infected patients. (Ho, Byington, et al., Infrequency of Isolation of HTLVIII Virus From Saliva In AIDS, Dec. 1985, New Eng J Med 1606.) The most extensive family study completed to date was reported within the past week, also in the New England Journal of Medicine, confirming that the virus could not be transmitted through casual contact. (New York Times, Chief of Study on Victims’ Families Doubts AIDS Is Transmitted Casually, Feb. 6, 1985.)

. As enacted by Laws of 1971 (ch 626), the applicability of the State Sanitary Code as a minimum standard was extended to include New York City. Thus, the Public Health Council was given jurisdiction to participate constructively in the State Commissioner’s State-wide decisions which affect New York City. The City of New York, like other political subdivisions, still reserves the power to enact sanitary regulations (as appear in the Health Code) not inconsistent with the Sanitary Code (Public Health Law § 228 [2]) or State law (NY City Charter § 558 [b]).

. In Kokomo, Indiana, a 13-year-old hemophiliac with AIDS has been attending school via telephone hookup while his lawyers exhaust four levels of State administrative appeals ordered in August by a Federal Judge (White v Western School Corp., IP 85-1192-C [SD Ind, Aug. 23,1985]).

. Since it appears that only epidemiological surveillance data is cloaked with absolute confidentiality the revelation of a child suspected of having AIDS or related conditions will in most cases come from outside referral sources, such as those delineated in the regulations on the Committee for the Handicapped. (8 NYCRR 200.4 [a].)