Eliana MARTINEZ, etc., Plaintiff,

v.

The SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA, etc., Defendant.

No. 87–1308–CIV–T–17(A).

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 23, 1987.

Stephen A. Hanlon, Tampa, Fla., for plaintiff.

W. Crosby Few and Thomas M. Gonzalez, Tampa, Fla., for defendant.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

KOVACHEVICH, District Judge.

This cause is before the Court on motion for preliminary injunction. The three count complaint was filed in this case on September 3, 1987. The complaint alleged the following: 1) violation of Plaintiff's right to a free and appropriate education pursuant to 20 U.S.C. § 1401, 2) deprivation of Plaintiff's right to a free and appropriate education in the least restrictive environment pursuant to § 504 of the Rehabilitation Act of 1973, and 3) deprivation of Plaintiff's right to a free and appropriate education in the least restrictive environment pursuant to the equal protection clause of the Fourteenth Amendment to the United States Constitution.

On September 10 and 21, 1987, this Court denied Plaintiff's motion and renewed motion for expedited trial. Thereafter, on October 8, 1987, Plaintiff filed the instant motion for preliminary injunction. Hearing on the motion for preliminary injunction was held on November 6, 1987. Following the hearing on the motion, the parties, by

order of the Court, submitted supplements to the motion and opposition to the motion.

In determining whether or not a preliminary injunction is appropriate, this Court must address the following issues: 1) the likelihood that the moving party will ultimately prevail on the merits of the claim, 2) the irreparable nature of the threatened injury, 3) the potential harm that might be caused to the opposing parties or others if the order is issued, and 4) the public interest, if any. Rule 4.06 (b)(1), Rules of the District Court of the United States for the Middle District of Florida.

## JURISDICTION AND VENUE

1. This action arises under Section 504 of the Rehabilitation Act of 1973, 20 U.S.C. § 1401, and the Constitution of the United States. The Court is vested with jurisdiction under 28 U.S.C. § 1331 and § 1343(3).

2. Venue lies in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Rule 1.02, Rules of the United States District Court for the Middle District of Florida.

## PARTIES

1. Plaintiff Eliana Martinez is the adopted child of Rosa E. Martinez. Eliana Martinez was born September 15, 1981, and resides in Hillsborough County, Florida with her mother and guardian.

2. Defendant School Board of Hillsborough County, Florida is a public entity organized under the laws of the State of Florida and is the governing body of the public school system in Hillsborough County, Florida. The Board is charged with the duty of providing a free and appropriate education to Plaintiff, in the least restrictive environment applicable to her individual circumstances.

Based on the evidence adduced at the hearing in this case, the supporting documentation, the complete court file, and the medical evidence and testimony introduced in this case and in Case No. 87–88–CIV–FtM–17, of which the Court takes judicial notice, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### FACTUAL BACKGROUND OF ELIANA MARTINEZ

1. Eliana Martinez, born September 15, 1981, in Puerto Rico, was born with respiratory distress and received thirty-nine blood transfusions during the first four months of life.

2. On August 9, 1982, Eliana came to live with Rosa Martinez in Puerto Rico. Thereafter, on June 14, 1983, Rosa Martinez moved to Tampa, Florida, where Eliana began school at the United Cerebral Palsy of Tampa in September 1983. Eliana stayed at that school for one year, attending three or four times a week.

3. In September, 1984, Eliana started school at Tampa Methodist Center, where she attended for a couple of months. In about November, 1984, Eliana began getting ill, her lymph nodes were enlarged and she had skin infections. In December, 1984, the child was admitted to Tampa General Hospital, under the care of Dr. Phillip DeVoe. Rosa Martinez was told that Dr. DeVoe suspected Eliana had AIDS Related Complex (ARC). That diagnosis was confirmed in April 1985.

4. Rosa Martinez and her family did not take any special precautions in caring for Eliana prior to the diagnosis of ARC. Rosa Martinez and her family have, to the date of the complaint, tested human immuno-deficiency virus (HIV) negative.

5. Following the ARC diagnosis, Eliana was placed at the Forest Home Health Agency, albeit with some difficulty in placement, from July 1985, until December 1986. At this facility, Eliana received physical, occupational, and speech therapy.

6. When Eliana had skin lesions in the past Mrs. Martinez has kept her home.

7. Eliana has never bitten anyone, and has not had a diarrhea problem in two years. However, Eliana is incontinent, lacking control over her bowels and bladder.

8. Bonnie W. Cowan, Speech Language Pathologist, did a speech-language evaluation on Eliana on August 19, 1987, at the National Institute of Health (hereinafter NIH). (Pl.Ex. 2). Ms Cowan observed that Eliana "drooled continually" and sucked her thumb and index finger "continually".

9. Eliana is a six year old child with a mental age of between one and one-half years, in expressive language, to at least three and one-half years, in perceptual-motor skills. (Pl.Ex. 3). She has been classified as a trainable mentally handicapped (hereinafter TMH) child.

10. It is the best medical judgment of the treating physician, Dr. DeVoe, that the Eliana should *not* be placed in an integrated classroom. Other physicians with the same opinion are Dr. Don Kwalick, Dr. Richard F. Lockey, and Dr. Phillip S. Adler.

11. Plaintiff presented the testimony, affidavit, and/or deposition of Drs. Wade P. Parks and Jack H. Hutto. Both doctors expressed the opinion that Eliana Martinez should be allowed into an integrated classroom and that Eliana's presence in the classroom presents only a remote theoretical possibility of transmission of the Acquired Immune Deficiency Syndrome (AIDS) virus.

12. Dr. Philip Pizzo, of the National Cancer Institute, (hereinafter NCI), is now Eliana's treating physician. Dr. Pizzo's affidavits have been submitted by Plaintiff. Dr. Pizzo's affidavits are limited to factual testimony regarding the treatment and prognosis of Eliana, as he is precluded from expressing any professional opinion as to the likelihood of transmission of the AIDS virus in the proposed educational setting. (Docket No. 29).

13. Dr. Parks has never examined or treated Eliana Martinez. His testimony is based on review of documentary evidence, reports, and transcripts. Dr. Parks contends that the issuance of guidelines by the Center for Disease Control (CDC) and other organizations is a dynamic and ongoing process, subject to change with increased knowledge. (Docket No. 38). Dr. Parks characterized the CDC guidelines as conservative, based on the state of knowledge at the time they were drafted. (Parks' depo. pg. 43). Dr. Parks stated that the CDC and American

Academy of Pediatrics are considering liberalizing the guidelines. To date no announced changes have been made by either organization in the existing guidelines.

14. In the summer of 1986, Rosa Martinez began the process of enrolling Eliana in public school. On September 11, 1986, a staffing meeting was held, with Mrs. Martinez present. The inter-disciplinary team, formed by the Board to make recommendations on children such as Eliana, recommended that she not be admitted to the trainable mentally handicapped program. The team recommended that Eliana be educated in the homebound program.

15. The Board voted unanimously to accept the recommendation of the team, based on Eliana's incontinence. Homebound instruction commenced for Eliana in October 1986.

16. Under 20 U.S.C. § 1415(f), Plaintiff was required to exhaust certain administrative remedies prior to commencement of suit. Plaintiff filed her administrative action in December 1986, with the Division of Administrative Hearings, State of Florida (DOAH).

17. An evidentiary hearing was held before the DOAH hearing officer on April 14 and 15, 1987. The August 25, 1987, hearing officer order upheld Defendant's decision not to enroll Eliana in an integrated classroom setting.

18. There are two schools in the City of Tampa with classrooms for elementary TMH children. Each school has two classes for the TMH child. At each school, one class contains eight children and the other one nine. Each class is staffed by a teacher and an aide. Each school has an attendant who is utilized in both classrooms. One school has one foster grandparent per class during the morning session. The other has no foster grandparent assistance. The classrooms operate five days a week from 8:30 a.m. to 2:30 p.m.

19. It has been suggested by Peggy Kelly, TMH teacher in Hillsborough County, that the School Board could provide a full-time aide for Eliana's care in the TMH classroom and facilitate her integration into the classroom. Dr. Betz, General Director of Exceptional Student Education for Hillsborough County, contends that provision of the aide would not solve the problem of interaction between Eliana and the other TMH children, which interaction and possibility of transmission of the AIDS virus is the basis for the denial of her admittance to these classrooms. (Betz' affidavit).

20. In August of 1987, Eliana was evaluated at NCI for entry into a Phase I study designed to assess the toxicity and efficacy of azidothymidine (AZT) for children with AIDS or ARC, an AIDS related complex. AZT is a chemical that inhibits multiplication of the HIV virus and has been approved by the Food and Drug Administration for symptomatic adults who have the HIV virus, the etiologic agent of AIDS. Before the drug can be approved for children there must be a demonstration of clinical safety and definition of appropriate dosage. This is done in a Phase I trial or study. While the primary focus of the Phase I study is safety, this study is also attempting to evaluate immunologic, virologic, and clinical benefits of AZT. (Docket No. 29).

21. On August 13, 1987, Eliana had a Hickman catheter placed in her chest. The catheter administers intravenously a continuous 24–hour infusion of AZT, to study whether a constant level of the drug will be safe and effective. (Docket No. 29).

22. As part of the study, a battery of psychological tests are administered at the beginning of the treatment, repeated after three months of AZT therapy, and followed by regular reassessments. The reason for the testing is to determine whether AZT will help to improve the encephalopathy which afflicts many individuals with HIV infection. Current estimates suggest that nearly all children with HIV infection will develop signs of dementia, characterized by loss of learned skills and neurological deterioration. More than half of the children referred to NCI for entry into Phase I studies have overt evidence of AIDS dementia. There may be a difficulty in delineating whether the psychological or neurological abnormalities are related to the HIV

infection or due to an underlying disease. (Pl.Ex. 3).

23. During the initial evaluation, it was clear that Eliana had significant neurological impairment; it was indeterminate then, how much was due to HIV, and, perhaps reversible. It was the evaluator's conclusion that Eliana was significantly impaired and her developmental level was very infantile; she showed no eye contact, engaged minimally, and demonstrated little interest in testing procedures. (Pl.Ex. 3).

24. On November 24, 1987, Dr. Pizzo stated that it was the subjective opinion that Eliana had progressed and improved her developmental and neurologic skills since beginning AZT treatment. The objective findings of November 18, 1987, confirmed that impression. Eliana is still significantly impaired, but showed improvement in "virtually all areas tested." She was more interactive, cooperative, and interested in testing. Her receptive language, self-help skills, and perceptual-motor skills were higher. She was engaging in a socially appropriate manner, walking, and using scissors and crayons. (Pl.Ex. 3).

25. Dr. Pizzo stated on November 24, that on the basis of the interim evaluation, they would expect Eliana to continue to improve on the AZT therapy, as to the part of her disability that is related to the HIV infection. Dr. Pizzo's letter stated Eliana should continue to make progress, but that her "... emerging social and developmental skills, however, cannot be enhanced or refined in isolation, however, and there is no doubt in my mind that her current progress would be supported by educational support and social interaction. Such a supportive environment might be found in a specialized educational setting." (Pl.Ex. 3).

## ACQUIRED IMMUNITY DEFICIENCY SYNDROME

AIDS is a viral disease involving the breakdown of the body's immune system. A "full-blown" case of AIDS is believed by the medical community to be "incurable and almost inevitably fatal." (U.S. Department of Justice Memo for General Counsel, June 20, 1986). As stated by Surgeon General C. Everett Koop, M.D., Sc.D., in an interview on July 31, 1987, this is the "real thing". The following findings are taken from *Ray v. DeSoto School District*, 666 F.Supp. 1524 (1987), the facts of which the Court takes judicial notice, and the evidence presented in regard to the pending motion for preliminary injunction.

While we wait for medical science to save us from what many think may be a raging, indiscriminate inferno, it is the task of this Court to deal with the here and now of this lethal, inevitably fatal disease, for which there is currently no innoculation and no cure. The mystery of the virus and its communicability challenges jurists legally to be assured our decisions do not lead us to allow proliferation of this disease by our ignorance.

The Court must take medical science as it *now* finds it; this decision may *not* be based on speculation of what the state of medical science *may be* in the future, no matter how close that future may be. No party "wins" in this; when we consider alternatives, what is the alternative to life?

Many people have expressed opinions in this case, both in favor of and opposed to the admission of this child to a TMH classroom. However, it becomes *solely* the duty of this Court to assimilate all of the opinion evidence, expert testimony, and factual allegations, in order to make a decision which is in accord with the law and in the *best* interests of the public in general, and the Hillsborough County School Board and Eliana Martinez specifically.

26. The first cases of the disease now known as AIDS were reported to the Public Health Service's Centers for Disease Control (CDC) in 1981. The CDC is the central repository for AIDS reporting and research in the United States. As of December, 1986, 28,098 patients (including 394 children under 13) meeting the CDC's case definition for AIDS, had been reported.

27. Current medical researchers have concluded that AIDS is caused by infection with human immuno-deficiency virus (HIV). The HIV is a human retrovirus, distinquished from other viruses by chromosome

structure and mode of replication, which penetrates chromosomes of certain human cells that combat infection throughout the body.

28. When the virus enters the body it begins to attack certain white blood cells (T-lymphocytes), which are an integral part of the human immune system. Specifically, the disease destroys, and generates qualitative abnormalities, in the victim's T-helper/inducer cells, which enable other components of the immune system to function. The virus thereby weakens the victim's immune system.

29. The earliest indications of HIV infection are: 1) detection of antibodies to the virus in the blood or 2) the actual isolation of HIV in the blood. The appearance of antibodies is known as seroconversion and can be detected before there is any noticeable immunological damage.

30. Presently it is not known with any certainty what percentage of those individuals testing seropositive will ultimately develop clinical AIDS. The U.S. Public Health Service has estimated that twenty to thirty percent (30%) of the seropositive population may develop AIDS by 1991. However, other medical experts postulate that the number of "healthy carriers" who eventually develop AIDS may be as much as ninety (90%) percent of the seropositive population. (*Readers Digest*, "AIDS: The Plague That Knows No Boundaries," June 1987).

31. An individual is not considered to have AIDS by testing seropositive. Indeed a person can test seropositive and display no symptomology. Also, a person can test seropositive and display a number of symptoms characteristic of the disease and not be considered to have AIDS. Rahter, an essential element of the definition of AIDS used for reporting purposes by the CDC is affliction with one or more of the opportunistic diseases which take advantage of the suppressed immune system. (U.S. Department of Justice Memo for General Counsel).

32. The CDC's narrow definition of AIDS has led to the creation of an informal classification known as AIDS-related complex (ARC). ARC generally applies to persons in high-risk groups "who manifest a constellation of signs and symptoms that are suggestive of the syndrome but do not manifest the secondary complication of the disease." (U.S. Department of Justice Memo for General Counsel). *Eliana Martinez has been diagnosed as having ARC and is now at this level of the course of the HIV virus, as opposed to the Ray boys who at the time of the motion for preliminary injunction had tested positive for HIV but demonstrated no symptomology.*

33. The general medical opinion at this time is that it is unlikely that an effective vaccine will be ready for at least five years; that is a vaccine, not a cure. (*Readers Digest*, "AIDS: The Plague That Knows No Boundries", June 1987). Dr. Good testified at the July 10, 1987, hearing in Case No. 87–88–CIV–FtM–17 that even if a vaccine were to have been discovered that date, it would be three to five years before it would be in widespread use.

34. Finding a vaccine is difficult because HIV is "... extremely complex. It also undergoes 'antigenic drift'—surface changes that confound the body's immune system ... 'If the drifts turn out to be significant, the search for a vaccine will become more difficult.'" (*Readers Digest*, "AIDS: The Plague That Knows No Boundaries", June 1987).

35. The attention in this case is directed to the possibility and/or probability of communicability of the AIDS virus by Elaina Martinez to this school district population. This Court is unaware of any researcher who claims to completely understand the transmission of AIDS or the HIV antibodies. The following is a summary of what has been represented to this Court as being the current state of medical science's understanding.

36. The risk groups, and their percentage of the AIDS population, now identified by the medical community are: 1) homosexuals or bisexual men (73%), 2) hemophiliacs (1%), 3) transfusion recipients (2%), 4) intravenous (IV) drug users (17%), 5) sexual partners of risk-group members (1%), and 6) infants born to infected mothers (1%).

Approximately five percent (5%) of the AIDS population does not fall into any of these groups, but researchers believe they came in contact with the virus in similar ways. (*AIDS: The Facts*, American Red Cross, May 1986).

37. HTLV–III/LAV has been isolated in a wide range of body fluids, including blood, semen, saliva, tears, breast milk, and urine. The risks of communications are known to have occurred in the following ways: 1) intimate sexual contact with an infected person, this is the most frequent method of transmission, 2) invasive exposure to contaminated blood or blood products, i.e., IV drug use, blood transfusion, or 3) perinatal exposure, from infected mother to infant. The Surgeon General of the United States, C. Everett Koop, M.D., Sc.D., in a July 31, 1987, interview recommended that we regard the presence of the HIV in body fluids other than blood, semen, and breast milk, as if it were not there.

38. Extensive and numerous studies have consistently found no apparent risk of HIV infection by individuals exposed through close, non-sexual contact with AIDS patients. These studies have demonstrated that contacts involving sharing of household items, such as toothbrushs, eating utensils, and baths or toilets, do not lead to HIV-infection. Similarly, there is no evidence that close personal, but non-sexual interaction, such as giving a bath, shaking hands or kissing on the lips, will cause HIV-infection. (Brief of AMA; Report of Surgeon General; *AIDS: The Facts*, American Red Cross).

39. The CDC, the American Academy of Pediatrics, and other medical groups have developed recommended guidelines concerning school attendance for children infected with the HIV antibody. (*AIDS: Recommendations and Guidelines*, Center for Disease Control, November 1982–November 1986; *Report of the Committee on Infectious Diseases*, American Academy of Pediatrics, 1986; *AIDS and Children*, American Red Cross, October 1986; and *Surgeon General Workshop on Children with HIV Infection and Their Fami-*

*lies,* April 6 through 8, 1987). The following constitute the recommendations of the American Academy of Pediatrics:

a. Most school-aged children and adolescents infected with HTIV–III should be allowed to attend school without restrictions and with the approval of the child's physician. Based on present data the benefits of unrestricted school attendance of these children outweigh the possibility that they will transmit the infection in the school environment.

b. Some infected students may pose an increased risk to others in school. Students *who lack control of their body secretions,* who display behavior such as biting, or who have open skin sores which cannot be covered require a more restricted school environment until more is known about the transmission of the virus in these circumstances. *Arrangements for special education should be made for children who are unable to attend regular classes.* (Emphasis supplied).

c. School districts should identify individuals, including the child's physician, who have the qualifications to evaluate whether or not an infected child poses a risk to others. Assessment of the need for educational alternatives to regular school should be performed regularly. Hygienic practices of an infected student may improve with maturation or deteriorate if the condition worsens. If a risk is determined to exist, the child should be removed from the classroom and an appropriate alternative education program established until a subsequent review determines that the risk has abated. At the time a decision is made to exclude a child from school, a plan for periodic review should be established.

d. The number of personnel aware of the child's condition should be kept to the minimum needed to assure proper care of the child and to identify situations where the potential for transmission may be increased. Persons involved in the care and education of an infected student must respect the student's right to privacy. Confidential records should be maintained.

e. All schools should adopt routine procedures for handling blood or body fluids, including the disposal of sanitary napkins, regardless of whether or not students with HTLV–III infection are known to be in attendance. School health care workers, teachers, administrators, and other employees should be educated about procedures which have been established by local codes. For example, soiled surfaces should be promptly cleaned with disinfectants, such as household bleach, diluted 1 part bleach to 10 parts water. Persons involved in cleaning contaminated surfaces should avoid exposure to open skin lesions or mucous membranes to blood or body fluids.

f. Children infected with HTLV–III may develop immunodeficiency, which increases their risks of experiencing severe complications from infections such as chickenpox, tuberculosis, measles, cytomegalovirus and herpes simplex virus. Those known to be infected should be excused from regulations which mandate live vaccines as a condition for school attendance. The child's physician regularly should assess the risk of an unrestricted environment on the health of the HTLV–III–infected student.

g. Routine screening of children for HTLV–III infection is not recommended.

The Pediatric Redbook also recommends that adolescents should be educated about risk factors for AIDS and HTLV–III infection, including sexual transmission, injecting drugs, and sharing needles or syringes. Those who are sexually active should be made aware of the risk of sexual exposure to persons known or suspected to have AIDS or HTLV–III infection. In addition, sexual contact with multiple partners, or with those who have multiple partners, increases the risk of infection. If adolescents are sexually active, they also should be counseled about the regular use of condoms reducing the risk of infection.

40. The recommendations promulgated by other medical groups are consistent with those quoted above. The CDC additionally recommends the following:

a. Decisions regarding the type of educational and care setting for HTLV–III/LAV-infected children should be based on the behavior, neurologic development, and physical condition of the child and the expected type of interaction with others in that setting. These decisions are best made using the team approach including the child's physician, public health personnel, the child's parent or guardian, and personnel associated with the proposed care or educational setting. In each case, risks and benefits to both the infected child and to others in the setting should be weighed.

b. All educational and public health departments, regardless of whether HTLV–III/LAV-infected children are involved, are strongly encouraged to inform parents, children, and educators regarding HTLV–III/LAV and its transmission. Such education would greatly assist efforts to provide the best care and education for infected children while minimizing the risk of the transmission to others.

## CONCLUSIONS OF LAW

■ The Court would remind everyone at this point that this cause of action is before the Court on a *motion for preliminary injunction.* As stated previously, this Court must address the following issues: 1) the likelihood that the moving party will ultimately prevail on the merits of the claim, 2) the irreparable nature of the threatened injury, 3) the potential harm that might be caused to the opposing parties or others if the order is issued, and 4) the public interest, if any. Since an injunction is an extraordinary and drastic remedy, *it will not be granted unless the movant clearly carries the burden of persuasion as to all four prerequisites United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983).

**Irreparable Injury**

Eliana Martinez has been and is being denied access, by the Board, to a TMH classroom. The question is whether this denial constitutes irreparable injury for

this child, in this particular factual situation.

 Irreparable injury is distinquished from mere injury, which can be adequately compensated through the award of money. *United States,* 720 F.2d 1511 at 1520.

The reality is that Eliana has already been dealt a hand not to be envied by anyone. At six years of age, Eliana faces mental and physical handicaps and a potentially life-threatening disease. Plaintiffs have preliminarily established that Eliana's personal progress, in socialization and development, would be well served by interaction with other children. Therefore, denial of the opportunity to lead as normal an educational and social life as possible would be adding insult to injury, *unless* it is established that she poses a real and present threat to the school population of Hillsborough County.

**Public Interest and Potential Harm to Others**

The public at large has several interests to be considered here. First, is the concern of the public to provide adequate, non-discriminatory education to all the children of this state. The children of this state include children like Eliana Martinez, who, through no fault of their own have contracted this disease provoking in many, fear and a desperate desire to segregate them. However, there is an equally important public interest in protecting the health and safety of the public at large, and here, specifically, the school population which would be in contact with Eliana, if she is returned to a TMH classroom.

 It is the duty of this Court to weigh all factors in this case and balance the competing interests, in order to determine if a preliminary injunction is appropriate. The Court finds that, under the facts of this case, the specific potential harm to others clearly outweighs the interests of Plaintiff, and that the public interest in this case weighs in favor of *not* returning Eliana Martinez to a classroom setting. *Where, as here, there is any question as to whether the public safety and welfare*

*is threatened, the Court must rule on the side of that public interest.*

Defendant asserts potential harm that may occur to Defendant and/or to the school population of Hillsborough County, including transmission of the disease in the classroom setting. Such assertion of risk as to transmission is not clearly rebutted by the evidence in this case. There is clearly divided expert medical evidence and opinion in this case. One expert, Dr. Parks', who seemingly rejects or at least seeks to modify the CDC guidelines, states unequivocally that this child would pose no more than a "remote theoretical potential for transmission which can be substantially reduced by taking routine precautions."

On the other hand we have several local doctors, one of which was Eliana's treating physician, who have testified and stated that she should not be returned to the TMH classroom. The Court notes that Eliana's present treating physician was not allowed to express an opinion as to likelihood of transmission in the educational setting proposed by Plaintiff in this case. Dr. Pizzo's statement in the November letter (Pl.Ex. 3) does not recommend Eliana be admitted to the TMH classroom. It merely expresses an opinion as to what would be most beneficial to Eliana in the terms of development.

We also have the, as yet unmodified, guidelines of the CDC that recommend that children who lack control of body secretions, Eliana is incontinent, may require a more restricted school environment. Is the TMH classroom such a "more restricted" school environment or must that be provided by homebound instruction in this case? For the purposes of this motion for preliminary instruction, the Court must consider the evidence in favor of the public interest. While the interests of the child must be considered by this Court, they are not necessarily determinate in the light of all the competing interests, including public safety.

**Likelihood of Prevailing on the Merits**

 The final prerequisite that Plaintiffs must establish, in order for a preliminary injunction to be granted, is the likelihood of

Plaintiffs prevailing on the merits in this case. The likelihood of success issue requires the Court to address the proper standard to be applied and application of that standard to the facts of this case. *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 334 (5th Cir. 1981).

 The Court notes that this appears to be a case of first impression, in that it has found, and the parties have presented, no case where an incontinent child, classified as trainable mentally handicapped, with a diagnosis of ARC, has sought admission into a TMH class. The Court, upon examination of the record and such scant legal precedent as is available, finds Plaintiffs have not carried their burden, at this stage of litigation, of establishing the likelihood that they will prevail on the merits of this case. *Accord, Ray v. DeSoto County School District*, 666 F.Supp. 1524 (M.D.Fla. 1987), *School Board of Nassau County, Florida v. Arline*, — U.S. —, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Thomas v. Atascadero Unified School District*, 662 F.Supp. 376 (C.D.Calif.1986); *District 27 Community School v. Board of Education*, 130 Misc.2d 398, 502 N.Y.S.2d 325 (1986).

The legal precedents and medical testimony presented in this case leaves clear doubt in this Court's mind as to whether or not in a trial on the merits the Plaintiff would prevail. This case, at this juncture, appears that it may turn into a battle of the experts as to whether or not Eliana Martinez poses a threat to the TMH population or whether, indeed, it is safe for her to attend a classroom with other children. Based on the posture of this case at this time, the Court must find that the motion for preliminary injunction is not well-taken. Accordingly, it is

ORDERED that Plaintiffs motion for preliminary injunction be DENIED.