OPINION OF THE COURT
Helen E. Freedman, J.
The issue to be determined in this proceeding is whether the New York City Commission on Human Rights (NYCCHR, *555 Commission or Human Rights Commission) was justified in finding that a dentist engaged in discriminatory practices when he terminated an agreement with another dentist to whom he leased operatory space because the latter treated patients with Acquired Immune Deficiency Syndrome (AIDS).
Petitioner, Lawrence A. Barton, D.D.S., was charged with and found guilty of discrimination on the basis of handicap in violation of section 8-107 (5) (b) and section 8-108 of the Administrative Code of the City of New York (Administrative Code). Complainant, John W. Wolf, D.D.S., was awarded $15,000 as "compensatory damages for mental anguish” and respondent Barton, petitioner here, was ordered to "cease and desist from engaging in discriminatory rental practices.”
Petitioner challenges the Commission’s findings and order on both jurisdictional and substantive grounds in what was filed as a CPLR article 78 proceeding, but which is in fact a special proceeding under section 8-110 of the Administrative Code seeking judicial review of the findings of NYCCHR.
Petitioner claims that complainant Wolf lacks standing to file a complaint; that the arrangement at issue, a lease of operatory rooms within a dental office for a limited number of hours per week, does not constitute a sublease of commercial space within the meaning of the Administrative Code; that the action is time barred; that treatment of AIDS patients is not a protected right as such; and that the findings of fact and conclusions of law are not supported by substantial evidence. Respondents have cross-moved pursuant to section 8-110 for an order enforcing the decision and order of the Human Rights Commission.
THE FACTS
While certain elements are in dispute, it appears that there is little or no disagreement concerning the basic facts. In January of 1985 both parties entered into a written sublease arrangement running from February 1, 1985 to February 28, 1986 which provided Dr. Wolf with the use of an operatory and certain office equipment in Dr. Barton’s office during Wednesday evenings and Saturdays each week. Prior to entering into that agreement, Dr. Wolf, then in the middle of his residency, had listed his name with the Gay Men’s Health Crisis (hereinafter GMHC), a nonprofit social service agency which provides the names of health professionals available to treat persons with AIDS.
*556 During the first two months of the sublease complainant treated 6 or 7 patients with AIDS. While treating patients complainant regularly wore masks, gloves and protective eye-wear but did not always wear a gown and all instruments used were soaked in disinfectant and autoclaved. Surfaces in the operatory were wiped down with Sporicidin, a disinfectant solution, which remained on the surfaces for 10 minutes.
Dr. Wolf also retained the services of Patricia Quinn, Dr. Barton’s secretary/receptionist, to take telephone calls, schedule appointments and assist Dr. Wolfs bookkeeper/receptionist Michael Savery. Ms. Quinn became concerned with the treatment of AIDS patients after a particular incident and reported it to Dr. Barton. On March 27, 1985, petitioner discussed Dr. Wolfs participation in the GMHC program and insisted that he remove his name from the GMHC referral list because he was concerned that the office would be "inundated” with AIDS patients. Dr. Barton feared the office would be unable to maintain proper sterilization procedures; that his own patients would seek treatment elsewhere; that the staff would object for fear of contracting AIDS; and that the landlord might be unwilling to handle the office refuse. Dr. Barton told Dr. Wolf that one of his patients had inquired about whether AIDS patients were being treated in the office and had suggested that if so she might not return. Despite extensive discussions about proper precautions to be taken with all patients, since a doctor does not necessarily know who is infected with the Human Immunodeficiency Virus (HIV), Dr. Barton remained adamant that complainant remove his name from the GMHC referral list and refrain from treating AIDS patients in the office.
Although Dr. Wolf had become something of an "expert” in the dental treatment of persons with AIDS, having lectured and conducted seminars in the area, and this fact was known to Dr. Barton before the lease was consummated, he agreed to treat AIDS patients on only an emergency basis. In April 1985, after finding it difficult to receive referral calls at home, Dr. Wolf requested that GMHC remove his name from the referral list. Dr. Wolf then told his AIDS and ARC (AIDS Related Complex) patients that they would have to go elsewhere for routine dental care, informing at least one who had five appointments scheduled that he would be unable to receive treatment. In May of 1985 Dr. Wolf extended his hours to two nights a week, switching to Tuesdays and Thursdays and on July 1, 1985 entered into a second written *557 sublease incorporating these hours and extending the lease to July 1, 1986.
In July of 1985 Dr. Barton stated that Dr. Wolf absolutely could not treat AIDS patients in the office. This ultimatum was precipitated by the fact that Dr. Barton learned that Dr. Wolf had made inquiries concerning disposal of infectious waste.
In a letter dated November 18, 1985, Dr. Wolf informed Dr. Barton that he intended to resume treating AIDS patients and advised Dr. Barton of his interest in renting space for a fourth day. In that letter he volunteered to educate Dr. Barton’s staff regarding infection control and transmission of the HIV virus and offered to schedule appointments for AIDS patients only when Dr. Barton and his staff were not present in the office.
In response to the above letter, Dr. Barton wrote a letter dated November 20, 1985, accusing Dr. Wolf of breaking the agreement not to treat AIDS patients and, for that reason, terminating the sublease agreement. Several days later Dr. Barton advised Dr. Wolf that he could take as long as he wanted to find new space as long as AIDS patients were not treated in the office; however, Dr. Wolf told Ms. Quinn in a letter dated December 18, 1985, that he was terminating their employment relationship as of December 23, 1985.
Dr. Wolf obtained new office space and sent out an announcement to his patients and friends indicating that he was relocating his practice as of March 1, 1986.
Pursuant to Administrative Code § 8-105 (4); § 8-107 (5) (b); §§ 8-108 and 8-109 (1), Dr. Wolf filed a verified complaint with the Human Rights Commission on April 28, 1986. He set forth the various factors described above and claimed damages which included moving costs, lost income from GMHC referrals, equipment purchase costs and other office expenses as well as mental anguish and emotional pain. Dr. Barton’s answer claimed that Dr. Wolf breached their agreement and that the letter of November 20, 1985 was not as a matter of law a termination of the sublease, but rather a letter advising Dr. Wolf that the lease would not be renewed on February 28, 1986.
After discovery and denial of a motion to dismiss, a four-day hearing took place before Administrative Law Judge William Kirchgaessner in April 1987. On December 21, 1987, the Human Rights Commission issued a decision and order adopting the recommendation of the Administrative Law Judge *558 which found Dr. Barton guilty of discrimination under section 8-101 et seq. of the Administrative Code. It found insufficient proof to sustain a recovery for out-of-pocket expenses or loss of income but awarded damages for mental anguish in the sum of $15,000 to Dr. Wolf and ordered Dr. Barton to cease and desist from engaging in further discriminatory rental practices.
JURISDICTION
At the outset, Dr. Barton contends that the space-sharing arrangement at issue did not involve the type of "commercial space” over which the Commission has jurisdiction. Under the Administrative Code, the commercial space subject to supervision by the Commission is: "any space * * * which is used or occupied * * * as a separate business or professional unit or office in any building, structure or portion thereof.” (§ 8-102 [13] [emphasis supplied].) Dr. Barton contends that the space at issue herein is not "separate” space, but only a portion of his office for only certain periods of time.
Respondent Human Rights Commission opposes consideration of this issue on the ground that section 8-110 of the Administrative Code provides that "[n]o objection that has not been urged before the commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances,” and Dr. Barton did not raise the issue before the NYCCHR. However, since the Commission expressly found that Dr. Barton’s "dental office is a commercial space as defined by the Code”, review by this court is appropriate.
The Human Rights Commission found that Dr. Wolfs relationship to the subject premises is covered by the Administrative Code, since Dr. Barton, as primary lessee of the commercial space in question, entered into a written sublease agreement with Dr. Wolf. The decision invoked section 8-107 (5) (b) and section 8-108 of the Administrative Code which prohibit discrimination in the leasing of commercial space by a "lessee, sublessee * * * or other person having the right * * * to sell, rent, or lease * * * commercial space”.
Counsel for respondent asserts that "separate” modifies "business”, and not "professional”, and that the Commission therefore has jurisdiction over professional offices that are not separate. If the Administrative Code were read otherwise, it is argued, the Commission would be ousted of jurisdiction over *559 any suite of offices sublet to different professionals. It would also appear to this court rational to infer that the term "separate” was used in the Administrative Code to exempt space which is a part of an individual residential structure leased or used for commercial purposes.
The interpretation that a lease of a dental operatory for certain hours was a commercial lease subject to the provisions of the Administrative Code was rational. Where there is ambiguity, deference is accorded to an agency’s own interpretation of its statutory and regulatory mandates, unless that construction is not rational. (Matter of Bernstein v Toia, 43 NY2d 437; Matter of Tommy & Tina v Department of Consumer Affairs, 95 AD2d 724 [1st Dept 1983], affd 62 NY2d 671.)
STATUTE OF LIMITATIONS
Petitioner further claims that the discriminatory event which formed the basis of Dr. Wolfs complaint to the Human Rights Commission actually occurred more than one year prior to the filing of the complaint, and is thus time barred under section 8-109 (3) of the Administrative Code. The particular event which petitioner claims was the only basis for the Commission’s finding occurred on March 27, 1985, when Dr. Barton insisted that Dr. Wolf remove his name from the GMHC referral list. Dr. Wolf, on the other hand, contends that the continuing requirement through November and December of 1985 until February 1986 that Dr. Wolf refrain from treating AIDS patients or from taking GMHC referrals constituted a continuing act of discrimination, thus rendering his April 1986 complaint timely.
The Human Rights Commission found a continuing course of discriminatory conduct at least through November 1985 when petitioner terminated the lease in response to Dr. Wolfs announcement of his intention to resume treating AIDS patients. Again the court must look only to the rationality of the determination that the alleged discrimination was of a sufficient continuing nature as to bring the claims within the Statute of Limitations. There is nothing in the record to suggest that any single occurrence during the year-long relationship between the parties can be isolated or identified as the one discriminatory practice. It was clearly the combination of events (insistence upon removal of the name from the GMHC in March 1985, the ultimatum in July 1985 concerning *560 treatment of AIDS patients, and the termination of the lease on November 20, 1985 after being informed that Dr. Wolf intended to resume treatment of AIDS patients) that formed the basis of the complaint. For those reasons, the Commission’s determination that the action was not time barred is rational.
AIDS AS PHYSICAL HANDICAP
Petitioner questions the Commission’s determination that under these circumstances persons with AIDS are entitled to the protection afforded physically handicapped persons under the Administrative Code.
Persons with AIDS have been found to be physically handicapped under section 8-108 of the Administrative Code. (Dimiceli & Sons Funeral Home v New York City Commn. on Human Rights, NYLJ, Jan. 14, 1987, at 7, col 3 [Sup Ct, NY County].) In reaching that decision the Dimiceli court noted (supra, at 12, col 1) that persons with AIDS “have been classified as ’handicapped’ under the Federal Rehabilitation Act of 1973 (29 USC, § 794; District 27 Community Board v N.Y. City Board of Education, 130 Misc. 2d 398), and the New York State Human Rights Law. (see, People of New York v. 49 West 12 Tenants Corp., Index No. 43604/83, Sup. Ct. Dec. 20, 1983 * * *).” Therefore, it was proper to conclude that AIDS is a physical handicap as contemplated by the Administrative Code.
STANDING
Petitioner also challenges the determination of the NYCCHR that Dr. Wolf had standing to complain inasmuch as he was not himself handicapped and thus not an “aggrieved party”. Section 8-109 (1) of the Administrative Code states that ”[a]ny person claiming to be aggrieved” may file a complaint and that the Commission may initiate proceedings on its own motion.
In Traficante v Metropolitan Life Ins. (409 US 205 [1972]), which involved interpretation of a similar provision of the 1968 Civil Rights Act, an “aggrieved party” was defined to include any person who claims to have been injured, based on ’’ ’a congressional intention to define standing as broadly as is permitted by Article III of the Constitution’ ” (supra, at 209). In Traficante, the court allowed Whites to bring an action claiming that non-Whites were discriminated against in ob *561 taining housing rentals on the theory that the Whites were injured by not enjoying the benefits of integrated housing. Other courts have also held that Whites who experience discriminatory treatment because of their association with Blacks have standing to sue. (See, e.g., Woods-Drake v Lundy, 667 F2d 1198 [5th Cir 1982]; United States v L & H Land Corp., 407 F Supp 576 [SD Fla 1976]; Bishop v Pecsok, 431 F Supp 34 [ND Ohio 1976]; Matter of Merrill v State Div. of Human Rights, 45 AD2d 548 [3d Dept 1974].)
In effect, courts have recognized that the objects of discrimination are often least able to avail themselves of remedies afforded and that discriminatory practices injure society as a whole. For that reason this court agrees that a person who sought to make his services available to a needy and discriminated against class and who was thwarted in those efforts had standing to complain.
EVIDENTIARY FINDINGS OF THE HUMAN RIGHTS COMMISSION
The Human Rights Law grants broad adjudicatory powers to NYCCHR. (New York State Club Assn. v City of New York, 69 NY2d 211 [1987].) Section 8-109 of the Administrative Code sets forth extensive procedures for hearing and determining matters. In this case, the hearings spanned four full days and nine witnesses testified. The Hearing Officer wrote a 49-page decision analyzing the evidence and making numerous factual findings based on an evaluation of the testimony as well as the manner and demeanor of witnesses and reached the conclusions discussed above. The Commission adopted those findings.
The remaining issue to be addressed is the rationality of the decision itself. The Administrative Code states: "The findings of the commission as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole” (§ 8-110). Dr. Barton is therefore obligated to show that the record as a whole does not support the factual findings. In an analogous matter, the Court of Appeals stated: "Courts may not weigh the evidence or reject the Division’s determination where the evidence is conflicting and room for choice exists. Thus, when a rational basis for the conclusion adopted by the Commissioner is found, the judicial function is exhausted”. (Matter of State Div. of Human Rights [Granelle], 70 NY2d 100, 106 [1987].) That court went on to say: "The question * * * is not whether we find the proof of discrimina *562 tion convincing, but whether the Commissioner could do so” (supra, at 106).
"Sufficient evidence” and "substantial evidence” have been held to be interchangeable and defined as "such relevant proof as a reasonable mind may accept as adequate to support a conclusion of an ultimate fact.” (300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 180 [1978].) The standard articulated is something less than a preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt, but must be "extracted reasonably — probatively and logically” from the record (supra, at 181). In sum, the burden rests on Dr. Barton to show that the agency abused its discretion in finding that discrimination existed.
In reaching its decision the Commission found that the sublease under which the parties operated contained no limitations as to the type of patients that Dr. Wolf could treat and did not contemplate a restriction against AIDS or HIV-positive patients. However, it found that Dr. Barton coerced Dr. Wolf into removing his name from the GMHC referral list two months after the subtenancy began and prevented him from treating patients with AIDS in spite of Dr. Barton’s prior knowledge about Dr. Wolfs expertise concerning treatment of AIDS patients.
In reaching its conclusion it noted that since Dr. Wolf was in the midst of his residency and had already paid the cost of moving he was in his words "boxed into a corner” and not in a position either to move or to defy Dr. Barton. At the same time, the Commission found that in requiring Dr. Wolf to remove his name from the GMHC referral list, Dr. Barton’s actions effectively deprived a protected class of potential patients, namely, persons with AIDS, from obtaining needed dental treatment.
While Dr. Barton argues alternatively that he did not compel Dr. Wolf to remove his name from the GMHC, but that Dr. Wolf did so voluntarily, and that he did not wish Dr. Wolf to stop treating AIDS patients, but just wanted his name removed from the GMHC, the record in its entirety supports the Commission’s conclusion that Dr. Barton did not want AIDS patients treated in his office, except in emergency situations and on rare occasions. For example: Dr. Barton was not interested in infectious waste disposal procedures, he feared an "inundation” of AIDS patients even though Dr. Wolf offered to treat them when Dr. Barton was not present *563 and no more than 6 or 7 came during the first two months; he became angry when he heard that Dr. Wolf was considering relisting himself with the GMHC; and he used the expression "deteriorated into” in describing an infectious disease conference during which the discussion turned primarily to AIDS and hepatitis.
The Commission also found Dr. Barton’s argument that he was concerned that proper sterilization procedures would not be maintained for patients with AIDS to be specious. All of the witnesses who addressed that issue including Dr. Barton himself indicated that the infection control procedures for treating AIDS patients are the same as those for other patients. Indeed, since medical and dental practitioners do not know who is infected with the HIV virus or who may be harboring more infectious and more easily transmitted viruses such as hepatitis B, proper infection control procedures must be followed for all patients. Dr. Wolf complied with the procedures recommended by the American Dental Association and the Center for Disease Control by wearing gloves, a mask and protective eye wear and by adhering to appropriate sterilization procedures. The issue of Dr. Wolfs failure to wear a gown, raised by petitioner, is also a somewhat transparent pretext inasmuch as gowns are not usually changed after each patient and the only person who might possibly be affected by the failure to wear a gown is the practitioner himself.
Petitioner also claimed that he feared losing patients and staff if the office were filled with AIDS patients. His receptionist/secretary Patricia Quinn cited one instance of a patient who inquired as to whether AIDS patients were treated in the office and indicated that she might not return if they were. Petitioner also called two of his own patients who were gay who testified that Dr. Barton had promised that he would treat them if they contracted AIDS. Since Dr. Barton indicated he was willing to treat an occasional AIDS patient, the fears of the patient who said she would not return would not be assuaged. Moreover, it is well settled that customer preference can never be the basis for discrimination. (See, Diaz v Pan Am. World Airways, 442 F2d 385 [5th Cir 1971].)
Dr. Barton raises certain other issues in his papers including the fact that the complaint to the NYCCHR did not specifically allege that Dr. Barton insisted that Dr. Wolf stop treating patients with AIDS. Although the complaint does not state in those words that Dr. Barton insisted that Dr. Wolf stop treating all AIDS patients, the pleadings certainly gave *564 adequate notice to enable Dr. Barton to prepare and set forth his defense. (See, Matter of Fitzgerald v Libous, 44 NY2d 660 [1978]; Liberty Mut. Ins. Co. v City of New York Commn. on Human Rights, 31 NY2d 1044 [1973].) The complaint alleges that Dr. Barton communicated his disapproval of Dr. Wolfs treatment of patients with AIDS which in turn caused Dr. Wolf to stop treating such patients. That the Commission’s findings are, if anything, stronger does not negate the whole claim.
The case cited by petitioner here, Matter of Merrill v State Div. of Human Rights (45 AD2d 548, supra) is substantially different in that another party complainant who sought separate compensatory damages had been added by the Hearing Officer. Moreover, as noted by counsel for the respondent Commission, substantial prehearing motion practice occurred so that Dr. Barton was fully apprised of the claims against him.
The credibility of witnesses including their demeanor and conduct are important factors that are best determined by the trial tribunal. Here the finder of fact concluded: "Complainant and his witnesses presented believable testimonies in a forthright manner. In contrast, Respondent and his witnesses presented inconsistent and evasive testimony concerning significant points. When courts look for substantial evidence in reviewing agency decisions, it is well settled that 'issues of credibility are for the administrative agency to decide and where there is sufficient evidence to support either of two opposing conclusions, the agency’s assessment of the veracity of the witnesses must be upheld.’ * * * Based on the record as a whole, we find that Complainant has offered sufficient credible testimony to support his discrimination claim and to show that the reasons proffered by Respondent were a pretext for discrimination.”
DAMAGES
Finally, the court will examine whether the $15,000 awarded for "outrage and mental anguish” are excessive. It is well established that the Commission has broad power to fashion legal remedies under section 8-109 (2) (c) of the Administrative Code (300 Gramatan Ave. Assocs. v State Div. of Human Rights, supra), and that: "The extremely strong statutory policy of eliminating discrimination gives the Commissioner of the Human Rights Division more discretion in effect *565 ing an appropriate remedy than he would have under strict common law principles * * * the right is statutory and involves a vindication of a public policy as well as a vindication of a particular individual’s rights.” (Batavia Lodge No. 196 v New York State Div. of Human Rights, 35 NY2d 143, 146 [1974].) Mental anguish has long been held to be a proper element of damages in a human rights case. (State Commn. for Human Rights v Speer, 29 NY2d 555.) Nevertheless, evidence of such an injury must be drawn from the circumstances of the case and based on reasonableness. (Cullen v Nassau County Civ. Serv. Commn., 53 NY2d 492.) The Commission cites numerous instances in the hearing record demonstrating that Dr. Wolf suffered severe emotional upset as a result of what it found was "unequivocal prohibition” against treatment of AIDS patients. He testified that: "Well, I’m a gay man. I have many friends * * * who either had AIDS or ARC * * * The dentists that I used to work for as a dental assistant, Dr. Iott and Dr. Zac both treated persons with AIDS and I knew that they were being inundated. There were relatively few who were willing to do so. The need was becoming greater and greater, and I wanted to do a service to my community.” He further testified that when he removed his name from the GMHC referral list he felt that he "was abandoning a good deal of friends and community.”
His lover Paul Barile testified that Dr. Wolf sustained "a loss of professional morality” meaning that he was "a dedicated person to his profession and also to the gay community. His inability to practice * * * to service the needs [of] the community manifested itself in that he felt a loss of professionalism.” Barile testified that during the period that the practice was restricted Wolf suffered severe mental anguish and depression, causing him to smoke excessively, overeat, be "very irritable” and "very short fused”. As a result the two had less sexual contact with each other.
Dr. Wolf also testified that he consulted a psychiatrist twice to discuss the frustration he felt in not being able to treat AIDS patients. In addition, the Commission found that Dr. Wolf was justifiably concerned about relocating his office for the third time in IV2 years.
The court is not unmindful of the fact that in the cases cited by petitioner the maximum award sustained by an appellate court was $7,500. Where the agency awarded a greater sum, the amounts were reduced to $5,000 or $7,500. (See, New York City Bd. of Educ. v Sears, 83 AD2d 959 [2d *566 Dept 1981]; Matter of Board of Educ. v State Div. of Human Rights, 109 AD2d 988 [3d Dept 1985]; State Univ. Agrie. & Tech. Coll. v State Div. of Human Rights, 134 AD2d 339 [2d Dept 1987].) However, in each of the cases cited above the mental anguish resulted from a single incident and the testimony concerning emotional upset was relatively vague. Here the anguish resulted from a course of conduct that continued for a period of eight months and affected a young professional at the beginning of his career because he was unable to treat a whole community of needy people. In addition, awards of $10,000 and $15,000, respectively, for mental anguish were upheld in two recent cases. (Cable Estates v Maxwell & Boyce, Sup Ct, NY County, Feb. 11, 1988, Wright, J., index No. 22066/86; Cruz v Zwan, NY City Commn on Human Rights No. 11061-EP, Apr. 30, 1986, affd Sup Ct, Queens County, Sept. 15, 1987.)
Thus, this court concludes that both the finding that Dr. Barton engaged in discriminatory rental practices in violation of section 8-107 (5) (b) and section 8-108 of the Administrative Code and that the sum of $15,000 for mental anguish only is an appropriate damage award are "supported by sufficient evidence on the record considered as a whole” (Administrative Code § 8-110), and that the decision and order of the Commission dated December 21, 1987 will not be disturbed.